STEVE SINGLETON v. HAYWOOD ELECTRIC MEMBERSHIP CORPORATION

No. 403A02

(Filed 5 December 2003)

## Trespass— real property—placement of electrical poles and power lines

The Court of Appeals did not err by affirming the trial court's entry of partial summary judgment in favor of plaintiff member in a trespass case arising out of defendant electric cooperative's placing of new electric poles and power lines on plaintiff's real property even though plaintiff asked defendant to enter the property to restring a downed transmission line, because: (1) a member only contracts to grant rights-of-ways and easements for the initial set up for the supply of electrical service for that individual member when he signs the parties' membership agreement; (2) the parties' "Conditions of Service" did not confer on defendant the unilateral right to utilize plaintiff's land to redesign an existing transmission line, add poles and lines, remove vegetative growth or cut down trees, and clear the path in order to restore power to other members; (3) defendant failed to obtain the necessary easements and rights-of-way before electing to redesign the downed transmission line; and (4) defendant did not have an express easement and has made no claim of a prescriptive easement.

Justice EDMUNDS dissenting.

Justice PARKER joining in dissenting opinion.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 151 N.C. App. 197, 565 S.E.2d 234 (2002), affirming a judgment entered 19 October 2000 by Judge Loto G. Caviness in Superior Court, Haywood County. On 3 October 2002, the Supreme Court granted discretionary review of additional issues. Heard in the Supreme Court 7 April 2003.

*Smathers & Norwood, by Patrick U. Smathers, for plaintiff-appellee.*

*Parker, Poe, Adams & Bernstein LLP, by Robert H. Tiller, Jack L. Cozort, and Irvin W. Hankins III, for defendant-appellant.*

*Smith Anderson Blount Dorsett Mitchell & Jernigan, LLP, by James D. Blount, Jr., Christopher G. Smith, and Kevin E. Pethick, on behalf of Progress Energy and Duke Power; Lawrence F. Mazer, Associate General Counsel, for Progress Energy; and Lara Simmons Nichols, Assistant General Counsel, for Duke Power, amici curiae.*

*Robert B. Schwentker for North Carolina Electric Membership Corporation; and Moore & Van Allen, PLLC, by Joseph W. Eason and Robert A. Meynardie, on behalf of the North Carolina Electric Membership Corporation, amicus curiae.*

Orr, Justice.

The issue before the Court is whether the Court of Appeals properly affirmed the trial court's entry of partial summary judgment for the plaintiff. For the reasons discussed herein, we affirm the decision of the Court of Appeals.

Defendant, Haywood Electric Membership Corporation (HEMC), is a rural electric cooperative owned by its members. Plaintiff, Steve Singleton, first became a member of HEMC in August of 1966 when he signed a membership application for that one year. In November of 1976 Singleton signed another membership application in which he agreed to purchase and use electric power for any properties he owned serviced by HEMC for the duration of his ownership of those properties. Every member agrees to be bound by the rules and regulations governed by HEMC when the member signs his membership application.

In February of 1998, following an ice storm, Singleton telephoned HEMC to report a downed transmission power line on property he had owned since September of 1995. The property, a 14.319 acre tract bearing two rental homes, is located on U.S. Highway 276 in Haywood County, North Carolina. The evidence showed that there were no transmission power poles located on the property and that the transmission line at issue crossed over Singleton's property at an approximate height of 300 feet from one mountain ridge to another. Norman Sloan, HEMC's General Manager, stated in his affidavit that this transmission line "had been in existence for more than 50 years." Prior to the ice storm and HEMC's subsequent repair work, the only power pole on Singleton's property was a service pole that provided electricity to the two rental homes on the property and was not connected to the transmission line in question.

Singleton stated in his affidavit that the transmission line at issue "did not serve [his] property." Ronnie Allen, an HEMC employee, stated in his affidavit that the downed transmission line served "178 meters" and that before HEMC repaired the downed line "those customers were without power." Additionally, Singleton stated in his deposition that the rental homes on his property did not lose power during the ice storm when the transmission line fell. Finally, the record does not reflect that the downed transmission line was connected to the service pole that provided electricity to Singleton's rental homes.

Singleton first reported the downed line to HEMC because he was concerned that a "child or an animal" might be electrocuted by the downed line. Three days after Singleton reported the downed line, he noticed that it had not been repaired, so he called HEMC to report the downed line again. Gary Best, an HEMC employee, stopped by Singleton's business to advise him of the status of the downed line. Best informed Singleton that HEMC would have to replace the transmission pole at the top of the ridge adjacent to Singleton's property line. Singleton told Best that HEMC would have to replace it "by hand" because he did not "want any vehicles up there."

Subsequently, HEMC entered Singleton's property and replaced the pole at the top of the ridge, placed two new poles on Singleton's property and cleared a "thirty to forty" foot-wide swath approximately 550 feet down the mountain on Singleton's property. HEMC also replaced existing copper wire with approximately 550 feet of aluminum wire. The transmission line formerly spanned from ridge to ridge at a height of 300 feet, but HEMC lowered the lines to a thirty-foot height. The new aluminum lines were substantially bigger in size, and, as a result, more visible. In order to complete this task, HEMC cut several large oak trees, pruned an apple orchard and cleared the river bank of vegetative growth on Singleton's property that formerly acted as a buffer from the highway and neighboring campground.

Singleton filed a complaint against HEMC on 17 November 1999 alleging four causes of action:

That the foregoing constitutes trespass to Plaintiff's real property, including ongoing trespass.

That the foregoing constitutes an unlawful taking and inverse condemnation of Plaintiff's real property.

That the foregoing constitutes a conversion of Plaintiff's real and personal property[.]

That the Plaintiff will be irreparably harmed if the poles and power lines are not removed from Plaintiff's real property, and Plaintiff is entitled to a mandatory injunction ordering and directing Defendant to remove said poles and utility lines.

Singleton later voluntarily dismissed the claims of inverse condemnation and conversion. The trial court granted partial summary judgment in Singleton's favor based on the theory that HEMC did "not have an express or prescriptive easement for placing utility lines, poles, or other electrical transmission equipment upon [Singleton's] real property, and that the actions of [HEMC] constitute[] trespass and a continuing trespass."

The case proceeded to trial on 9 October 2000 on the single remaining issue of money damages. The jury awarded Singleton $700.00 per month for rental of the land. The trial court ordered HEMC to pay Singleton "the sum of $22,125.80 as rental from February 21, 1998 through October 10, 2000" for retroactive rent payment. The trial court further ordered that HEMC would "remain liable for rental sums to the Plaintiff from October 10, 2000 until all power lines, power poles, and other miscellaneous transmission equipment are removed from Plaintiff's real property . . . and any other damages which may result from Defendant's continuous trespass." The trial court ordered HEMC to pay Singleton interest in "the sum of $1,591.72" from the date of filing (17 November 1999) through the date of the judgment (10 October 2000).

HEMC appealed the trial court's grant of partial summary judgment to the Court of Appeals, which affirmed the trial court with Judge Walker dissenting. *Singleton v. Haywood Elec. Mbrshp. Corp.*, 151 N.C. App. 197, 565 S.E.2d 234 (2002). The trial court found, and the Court of Appeals agreed, that there was no express easement or a prescriptive easement and no genuine issue of material fact existed for Singleton's claim of continuing trespass. Thus, Singleton was entitled to judgment as a matter of law.

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C.G.S. § 1A-1, Rule 56(c)(2001). "[T]he movant must

meet the burden of proving an essential element of plaintiff's claim does not exist, cannot be proven at trial or would be barred by an affirmative defense." *Goodman v. Wenco Foods, Inc.*, 333 N.C. 1, 21, 423 S.E.2d 444, 454 (1992).

There are two issues before this Court. First, the dissent argued that a genuine issue of material fact exists as to whether HEMC exceeded the scope of the membership service agreement thus making the trial court's grant of partial summary judgment improper. Second, this Court granted HEMC's petition for discretionary review on whether the trial court should have granted summary judgment in HEMC's favor because consent to entry on the property is a complete defense to trespass.

First, we will address the issue raised by HEMC's petition for discretionary review. As to this issue, HEMC contends that no genuine issue of material fact exists but that HEMC was authorized to perform the work at issue both by contract (membership rules and regulations) and by Singleton's request to repair the downed line. Thus according to HEMC, it is entitled to judgment as a matter of law because there was no trespass as a matter of law.

We first turn to the law of civil trespass. It is elementary that "trespass is a wrongful invasion of the possession of another." *State ex rel. Bruton v. Flying "W" Enterprises, Inc.*, 273 N.C. 399, 415, 160 S.E.2d 482, 493 (1968). " 'Furthermore, a claim of trespass requires: (1) possession of the property by plaintiff when the alleged trespass was committed; (2) an unauthorized entry by defendant; and (3) damage to plaintiff.' " *Fordham v. Eason*, 351 N.C. 151, 153, 521 S.E.2d 701, 703 (1999) (quoting *Fordham v. Eason*, 131 N.C. App. 226, 229, 505 S.E.2d 895, 898 (1998)); *See also Matthews v. Forrest*, 235 N.C. 281, 283, 69 S.E.2d 553, 555 (1952). The courts of this State have defined continuing trespass as "wrongful trespass upon real property, caused by structures permanent in their nature." *Oakley v. Texas Co.*, 236 N.C. 751, 753, 73 S.E.2d 898, 898 (1953); *See also Bishop v. Reinhold*, 66 N.C. App. 379, 384, 311 S.E.2d 298, 301, *disc. rev. denied*, 310 N.C. 743, 315 S.E.2d 700 (1984); *Teeter v. Postal Tel. Co.*, 172 N.C. 783, 786, 90 S.E. 941, 941 (1916), and *Sample v. Roper Lumber Co.*, 150 N.C. 161, 166, 63 S.E. 731, 732 (1909).

Singleton is the record owner of the property at issue and alleges damages as a result of HEMC's placement of new electric poles and lines and the damage to his property necessitated by the new poles

and lines. There is no dispute that Singleton asked HEMC to enter the property to re-string the downed transmission line as it had been for the last fifty years. However, Singleton does not complain about HEMC's physical entrance onto the land; rather, Singleton complains that the placement of new poles and lines in order to re-design the existing transmission line constituted trespass because the new poles and lines were "unauthorized, and therefore an unlawful entry." *Matthews*, 235 N.C. at 283, 69 S.E.2d at 555. Singleton complained that the new poles and lines were "permanent in their nature" and therefore amount to a continuing trespass. *Oakley*, 236 N.C. at 753, 73 S.E.2d at 899. Furthermore, Singleton complained that he was damaged by HEMC's cutting of the trees and clearing of the land.

In a trespass action a defendant may assert that the entry was lawful or under legal right as an affirmative defense. *Hildebran v. Southern Bell Tel. & Tel. Co.*, 216 N.C. 235, 236, 4 S.E.2d 439, 439 (1939). Because Singleton consented to HEMC's entry upon the land, the crucial question for determination is whether HEMC had authorization or consent to repair and replace the lines in the manner that it did.

HEMC concedes that it had no express easement and does not argue that it had an easement by prescription. HEMC argues, however, that Singleton contractually authorized HEMC to maintain, repair, and replace HEMC's equipment when he agreed to be bound by the membership rules and regulations found in the service agreement. HEMC submits that the rules and regulations operated as consent for HEMC's actions because it expressly provides that members must grant "all necessary easements and rights-of-way." HEMC further submits that this operative agreement authorized it to re-design the existing transmission line, and that this service agreement prevented the new lines and poles from creating a continuing trespass.

Section V, titled "Conditions of Services," of the membership service agreement set out member responsibilities before electrical service will be supplied to the member. HEMC contends these "Conditions of Service" bind the member "to furnish without cost to the Cooperative all necessary easements and rights-of-way" and oblige the member to provide the "right of access to member's premises at all times for the purpose of . . . repairing, removing, maintaining or exchanging any or all equipment." Section V states in pertinent part:

A. General Conditions

*The Cooperative will supply electrical service to the Member after all of the following conditions are met:*

1. The Member is in compliance with all aspects of the Service Agreement and agrees to be bound by the Cooperative's Articles of Incorporation and Bylaws.

2. *The Member agrees to furnish* without cost to the Cooperative all necessary easements and rights-of-way.

. . . .

4. The Member agrees that the Cooperative will have the right of access to member's premises at all times for the purpose of reading meters, testing, *repairing, removing, maintaining or exchanging any or all equipment and facilities which are the property of the Cooperative,* or when on any other business between the Cooperative and the Member. In cases where it is reasonably necessary and cost effective, the Cooperative may use, without payment to the Member, the Member's premises for accessing neighboring property served by the Cooperative. However, *the Member will have the opportunity to locate a right-of-way that is beneficial to all parties.*

. . . .

8. The Member agrees to be responsible for any additional facilities, protective devices, or corrective equipment necessary to provide adequate service or prevent interference with service to the Cooperative's other members.

In interpreting contracts, we adhere to the following rules of construction:

[T]he goal of construction is to arrive at the intent of the parties when the [contract] was issued. Where a [contract] defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect.

*Gaston County Dyeing Machine Co. v. Northfield Ins. Co.,* 351 N.C. 293, 299-300, 524 S.E.2d 558, 563 (2000) *(quoting Woods v.*

*Nationwide Mut. Ins. Co.*, 295 N.C. 500, 505-06, 246 S.E.2d 773, 777 (1978)); see also *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Engineering Co.*, 326 N.C. 133, 142, 388 S.E.2d 557, 563 (1990).

The scope of the "Conditions of Service" is expressly limited to "supply of electrical service to the Member." The rules and regulations define "Member" as "the person . . . that has the legal responsibility for payment of the bill for service." The express language of the "Conditions of Service" requires that these conditions be met before the service will be supplied: "The Cooperative will supply electrical service to the Member *after all of the following conditions are met.*" (Emphasis added.) Read in light of the scope and time limitations, a member only contracts to grant rights-of-ways and easements for the initial set up for the supply of electrical service for that individual member.

The evidence showed that the downed transmission line did not provide electrical service to Singleton because unlike the other 178 HEMC members, his rental homes never lost power during the ice storm. Therefore, the "Conditions of Service" did not confer on HEMC the unilateral right to utilize Singleton's land to re-design an existing transmission line, add poles and lines, remove vegetative growth or cut down trees, and clear the path in order to restore power to other HEMC members.

Next, HEMC relies on Section V, subsection D, titled "Right-of-Way Maintenance" as its authority to maintain the transmission line in the manner that it did. Section V, subsection D, states in full:

> *The Member will grant to the Cooperative,* and the Cooperative *will maintain right-of-way* according to its specifications with the right to cut, trim, and control the growth of trees and shrubbery located within the right-of-way or *that may interfere with or threaten to endanger the operation or maintenance of the Cooperative's line or system.* When trimming the right-of-way, the Cooperative will remove debris at its expense from "clean and maintained" areas; that is, an area which is regularly maintained free of logs and brush, but not the removal of stumps. In other areas, right-of-way debris will be left in the right-of-way limit.

(Emphasis added.)

The plain language of this section assumes that HEMC obtained the necessary easements and rights-of-ways prior to entering the

SINGLETON v. HAYWOOD ELEC. MEMBERSHIP CORP.

[357 N.C. 623 (2003)]

property to "cut, trim, and control the growth of trees and shrubbery." This section is in the future tense, stating: "the member *will* grant . . . and the Cooperative *will* maintain." This language, along with the language in the preceding "Conditions of Service" assumes that prior to HEMC servicing its members with electricity, it will obtain all necessary easements and rights-of-way to maintain, repair and replace its equipment utilized in the furnishing of electricity to the member. HEMC failed to obtain those necessary easements and rights-of-way before electing to re-design the downed transmission line.

Interpreting the rules and regulations in the way that HEMC desires would result in far reaching powers for HEMC over the lands of consumers it services. For example, if HEMC had unlimited access for "repairing, removing, maintaining or exchanging" its equipment over and above that which provides electricity to the member, then the power company could arguably place a transformer or substation on any member's property without the landowner's consent or compensation for the taking. This is simply not the case under North Carolina real property law. Prior to re-designing the existing line, HEMC could have negotiated for an easement or used its power of eminent domain under N.C.G.S. § 40A-3(a)(1).

The rules and regulations, read as a whole, did not confer on HEMC the unilateral right to increase its presence and use of Singleton's land above and beyond the original use. As previously noted, HEMC did not have an express easement and has made no claim of a prescriptive easement. Because HEMC failed to obtain an easement or right-of-way before redesigning the existing transmission line by erecting two poles, lowering the line from a height of 300 feet to a thirty-foot height, removing vegetation and trees in a thirty to forty foot swath, its actions were "unauthorized, and therefore an unlawful entry" and thus constituted continuing trespass as a matter of law. *Matthews*, 235 N.C. at 283, 69 S.E.2d at 555. Therefore, summary judgment should not have been granted in HEMC's favor and the trial court properly denied HEMC's motion for summary judgment.

Next, the dissent raised the issue that summary judgment should not have been granted in Singleton's favor because a genuine issue of material fact still existed regarding whether HEMC "committed an act in excess of the authority granted under the service rules and regulations." *Singleton*, 151 N.C. App. at 207, 565 S.E.2d at 241. This issue is subsumed by the issue of whether the service rules and reg-

ulations operated as a defense against the trespass action. As previously discussed, we conclude that HEMC's acts were "unauthorized, and therefore an unlawful entry," and that Singleton did not consent by signing the rules and regulations. *Matthews*, 235 N.C. at 283, 69 S.E.2d at 555. Thus, since there is no genuine issue of material fact and no right under the membership agreement to perform the work complained of, the Court of Appeals correctly affirmed the trial court in granting partial summary judgment in Singleton's favor.

Finally, the Court of Appeals properly dismissed HEMC's estoppel argument because HEMC did not properly assign error on this basis because it failed to "state plainly, concisely and without argumentation the legal basis upon which error is assigned" in violation of the Rules of Appellate Procedure. N.C. R. App. P. 10(c)(1) (2001).

For the reasons stated herein, the opinion of the Court of Appeals is affirmed.

AFFIRMED.

Justice EDMUNDS dissenting.

I fear that the majority's restrictive reading of the Haywood Electric Membership Corporation Service Rules and Regulations may have unfortunate consequences. The wire that fell during the February 1998 ice storm had been in place for at least fifty years. Defendant initially entered plaintiff's property pursuant both to plaintiff's express invitation and to Section V(A)(4) of the Service Rules and Regulations, which gives defendant the "right of access to [plaintiff's] premises at all times for the purpose of . . . repairing . . . any or all equipment and facilities which are the property of [defendant]." The issue now before us is whether the actions defendant took thereafter, replacing the wire with one that was heavier and hung substantially lower, erecting new poles, cutting vegetation along the wire's right-of-way, and so on, resulted in a continuing trespass. The majority's holding, that summary judgment for plaintiff was properly granted, fails to recognize that the evidence in this case presents a genuine issue of material fact.

It is apparent from the discussion in the majority opinion that the fallen power line was, at best, obsolescent. Defendant used the opportunity presented by the ice storm to erect modern equipment in its place. Section V of the Service Rules and Regulations permits defendant to enter plaintiff's land for the purposes of "maintaining or

exchanging . . . equipment and facilities" and of "maintain[ing the] right-of-way." It is inconceivable that defendant would have signed this agreement if it understood that, by so doing, it would not be permitted at its discretion to update or replace antiquated equipment that was on or crossed over property belonging to plaintiff and others. A fifty-year-old infrastructure would be inefficient, unprofitable, and probably unsafe, benefitting neither plaintiff nor defendant. Nevertheless, under the majority's holding, a utility provider such as defendant may be discouraged from making improvements to its equipment. On the other hand, it also seems unlikely that, when plaintiff called on defendant to repair the line, he had any expectation that wholesale and intrusive changes would follow. Accordingly, I believe that a genuine issue of material fact exists as to whether defendant's actions on plaintiff's property fall within the meaning of "repairing . . . maintaining or exchanging any or all equipment or facilities" as those terms are used in the Service Rules and Regulations. This case should be tried. I respectfully dissent.

Justice PARKER joins in this dissenting opinion.