OUTDOOR LIGHTING PERSPECTIVES FRANCHISING, INC. v. HARDERS

[228 N.C. App. 613 (2013)]

———————————

OUTDOOR LIGHTING PERSPECTIVES FRANCHISING, INC., PLAINTIFF
v.
PATRICK HARDERS, OUTDOOR LIGHTING PERSPECTIVES OF NORTHERN VIRGINIA, INC., AND ENLIGHTENED LIGHTING, LLC, DEFENDANTS

No. COA12-1204

Filed 6 August 2013

**Franchise—non-compete agreement—preliminary injunction**

The trial court did not err by denying plaintiff's request for a preliminary injunction against defendants from having any involvement in an outdoor lighting business. Considering elements of the tests utilized in both the employee-employer and business sale context to determine the likelihood that plaintiff would prevail in the present litigation, the trial court correctly determined that plaintiff was unlikely to prevail in its attempt to obtain enforcement of the non-competition agreement contained in the franchise agreement.

Appeal by plaintiff from order entered 14 May 2012 by Judge James L. Gale in Mecklenburg County Superior Court. Heard in the Court of Appeals 27 February 2013.

*Gray, Plant, Mooty, Mooty & Bennett, P.A., by Michael R. Gray; Parker Poe Adams & Bernstein, LLP, by William L. Esser, IV, and Katie M. Iams, for Plaintiff.*

*Hagan Davis Mangum Barrett & Langley, PLLC, by Jason B. Buckland and D. Beth Langley, for Defendants.*

ERVIN, Judge.

Plaintiff Outdoor Lighting Perspectives Franchising, Inc., appeals from an order entered by the trial court denying its request for the issuance of a preliminary injunction against Defendants Patrick Harders, Outdoor Lighting Perspectives of Northern Virginia, Inc. (OLP-NVA), and Enlightened Lighting, LLC, prohibiting Mr. Harders and Enlightened Lighting from having any involvement in an outdoor lighting business. On appeal, Plaintiff argues that the trial court erred by failing to enforce the non-competition agreement between itself, on the one hand, and Mr. Harders and OLP-NVA, on the other, in its entirety on the grounds that none of the covenant's provisions were overly broad or otherwise unenforceable. After careful consideration of Plaintiff's challenges to the trial court's order in light of the record and the applicable law, we conclude that the trial court's order should be affirmed.

## I. Factual Background

### A. Substantive Facts

#### 1. Plaintiff's Evidence

Plaintiff is a corporation which enters into franchise agreements authorizing franchisees to engage in the design, construction, and installation of residential and commercial outdoor lighting products. Mr. Harders began operating an OLP franchise, OLP-NVA, between July and October of 2001. Pursuant to the underlying franchise agreement, Mr. Harders had the right to operate an OLP franchise in an exclusive territory consisting of Arlington, Fairfax, Prince William, and Loudoun Counties in Virginia using the trademarked name of "Outdoor Lighting Perspectives®" for a five-year term. According to the franchise agreement, Mr. Harders and OLP-NVA were required to safeguard confidential OLP information and trade secrets during the term of the agreement.

The franchise agreement also required Mr. Harders and OLP-NVA to return all franchise materials to OLP upon the termination of the contract or the expiration of the franchise term and prohibited Mr. Harders and OLP-NVA from operating another outdoor lighting business within a specified area for a period of two years beginning on the date upon which the franchise agreement terminated or expired.

In the course of his work as an OLP franchisee, Mr. Harders received training and support services from OLP in the form of attendance at workshops, seminars, and conventions. In addition, Mr. Harders was provided with a manual that contained proprietary information deemed necessary to permit the proper operation of an OLP franchise. A number of the manuals given to Mr. Harders and OLP-NVA contained information concerning standardized "marketing, sales, operations, products and services." Although techniques concerning the installation of outdoor lighting are "relatively universal," the information that Plaintiff provided to Mr. Harders and OLP-NVA addressed all facets of the outdoor lighting business, including "organization, marketing and promotion, sales techniques, design techniques, pricing and estimating, maintenance, customer service, accounting, billing and collections." Finally, Plaintiff referred approximately nineteen projects to Mr. Harders and OLP-NVA during the term of the franchise agreement, which projects generated around $60,000 in income. After Mr. Harders and OLP-NVA operated this OLP franchise consistently with the terms of the franchise agreement throughout the initial five-year term, the parties renewed their agreement for a subsequent five-year term on 23 October 2006.

In 2008, Plaintiff was purchased by Outdoor Living Brands (OLB), an entity which owned two subsidiaries: Mosquito Squad® and Archadeck®. OLB had not been previously involved in the outdoor lighting business. During the acquisition process, OLB surveyed OLP franchise owners for the purpose of inquiring into their level of satisfaction with the franchise system. Mr. Harders offered exclusively positive comments in the course of responding to this survey.

In October 2011, Plaintiff contacted Mr. Harders for the purpose of informing him of the steps that needed to be taken in order to renew the franchise agreement. At that time, Mr. Harders informed Plaintiff that he had received a phone call from a customer informing him that the customer had been contacted by an individual representing himself to be the new owner of OLP-NVA who claimed to have been going through Mr. Harders' database for the purpose of introducing himself to all of Mr. Harders' existing customers. After receiving that information, Plaintiff assured Mr. Harders that the franchise had not been awarded to anyone

else and determined that no one had had access to Mr. Harders' database without first having received permission to do so from him. Even so, Mr. Harders and OLP-NVA allowed their franchise agreement with Plaintiff to expire on 23 October 2011, specifically informing Plaintiff two days later that they no longer had any interest in remaining affiliated with OLP.

In January of 2012, Corey Schroeder, Plaintiff's Vice President and Chief Financial Officer, read an article in *Loudoun Magazine* which indicated that Mr. Harders was operating an outdoor lighting business under the name of "Enlightened Landscape Lighting." A number of projects which Mr. Harders had completed while operating as an OLP franchise were displayed on the new business' website. As a result, counsel for Plaintiff sent a letter to Defendants' attorney dated 18 January 2012 stating that Plaintiff was aware that Mr. Harders was operating an outdoor lighting business within his former territory and giving Mr. Harders ten days to voluntarily comply with the post-expiration restrictions contained in the franchise agreement. In addition, Plaintiff requested that Mr. Harders cease attempting to supply other OLP franchisees with fixtures from China because of quality issues associated with the use of such fixtures and because Mr. Harders was not an approved supplier of such products. Plaintiff did not, however, attempt to totally exclude Mr. Harders from participating in the interior lighting business. Mr. Harders, however, refused to cease operating his outdoor lighting business and to deliver allegedly proprietary information in his possession, including his customer list, to Plaintiff.[1]

## 2. Defendants' Evidence

Mr. Harders, who had purchased an OLP franchise in 2001, served as president of OLP-NVA. As part of the process of operating an OLP franchise, Mr. Harders entered into a franchise agreement that was drafted by OLP on or about 23 October 2006. During the time in which he operated as an OLP franchisee, both OLP and OLP-NVA were in the business of providing low-voltage outdoor landscape lighting. However, neither entity was involved in providing "mercury vapor (moonlighting), high voltage outdoor landscape installations, and exterior attached home

1. According to Plaintiff, a number of other OLP franchisees were likely to surrender their franchises and begin operating outdoor lighting businesses in competition with Plaintiff in the event that the provisions of the franchise agreement were not enforced against Defendants. At least two potential purchasers of OLP franchises refused to acquire a franchise in the territory which had been assigned to Mr. Harder unless he was enjoined from continuing to operate his business due to the goodwill that he had created with customers while serving the territory as an OLP franchisee.

lighting using 120 volt fixtures and wiring (security lighting, entrance-way lighting, outdoor lampposts)."

During the time in which Mr. Harders operated as an OLP franchisee, entities holding OLP franchises encountered numerous problems with OLP suppliers. Since OLB purchased Plaintiff in 2008, numerous franchises have closed and the OLP business model has been devalued. Among other things, Plaintiff failed to provide its franchisees with adequate support, feedback, and product innovation. Although the information provided to Mr. Harders and OLP-NVA by OLP was alleged to be proprietary, much of it was publicly available and common knowledge in the industry. Similarly, the training that Mr. Harders had received from Plaintiff was readily available without charge in many national home improvement stores.

In spite of the apparent decline in the value of an OLP franchise, Mr. Harders engaged in discussions aimed at the renewal of his franchise agreement in the summer of 2011. Although Mr. Harders had scheduled a meeting with OLP representatives to discuss the possible renewal of his franchise on 26 October 2011, an unidentified individual called at least one of Mr. Harders' customers on or about 20 October 2011 and asked about the status of the customer's outdoor lighting. During the ensuing conversation, the caller told the customer that Mr. Harders was no longer associated with OLP, that Mr. Harders no longer owned OLP-NVA, and that OLP-NVA was now under new ownership. Mr. Harders deemed these actions to constitute a premature termination of his franchise agreement.

At some unspecified point, Mr. Harders began operating Enlightened Lighting, in which he used training obtained from sources other than OLP to perform advanced installations that the training which he had received from OLP did not qualify him to perform. The physical address and telephone number for Enlightened Lighting differed from that of OLP-NVA, and Mr. Harders refrained from "actively solicit[ing]" former customers. Although the website that Mr. Harders created for Enlightened Lighting contained photographs of completed jobs, all of the projects depicted in these photographs had been finished after the expiration of the franchise agreement between Plaintiff and Mr. Harders. In addition, despite the fact that he admitted having retained certain manuals, records, and other information from OLP, Mr. Harders claimed to have kept nothing other than the documents needed to defend himself and his businesses in this action.

After Enlightened Lighting began operating, Plaintiff informed Mr. Harders that it would seek to enforce the post-expiration provisions of

the franchise agreement. Among other things, OLP specifically told Mr. Harders that serving as a wholesale supplier of outdoor lights would constitute a violation of the agreement. In March 2011, OLB informed Mr. Harders that, in the event that he opened a business installing interior, as compared to exterior, lights, OLP would invoke the provisions of the franchise agreement in an effort to prevent him from operating such a business.

### B.  Procedural History

On 5 March 2012, Plaintiff filed a complaint against Defendants seeking damages stemming from Defendants' failure to pay royalties and other fees, misappropriation of good will, and engaging in a civil conspiracy; injunctive relief stemming from Defendants' alleged non-compliance with the post-expiration restrictions contained in the franchise agreement; and rectification of Mr. Harders' failure to return certain manuals, customer lists and other items following the termination of the franchise agreement. On 6 March 2012, Plaintiff filed a motion seeking the issuance of a preliminary injunction requiring Plaintiff to return specific proprietary information, to cease misappropriating Plaintiff's good will, and, for a period of two years, to refrain from "engaging either directly or indirectly in any activity involving the marketing, selling, repairing, remodeling, enhancing, constructing, installing, or maintaining residential or commercial outdoor lighting products and services within the Defendants' former territory consisting of the counties of Arlington, Fairfax, Prince William, and Loudoun in the Commonwealth of Virginia or within the territory of any other OLP franchisee." In the course of subsequent proceedings, Mr. Schroeder executed an affidavit notifying Defendants that Plaintiff was exercising its contractual right to reduce the geographical scope of the post-expiration restrictions contained in the franchise agreement by eliminating the 100-mile zone around the territory in which Mr. Harders and OLP-NVA had operated as an OLP franchisee from the area in which Defendants should be prohibited from participating in the outdoor lighting business.

Although Plaintiff's motion for the issuance of a preliminary injunction was originally scheduled to be heard on 3 April 2012, Defendants filed a motion seeking to have this case designated as a mandatory complex business case pursuant to N.C. Gen. Stat. § 7A-45.4 on 27 March 2012. On 28 March 2012, Defendants' motion was granted. Subsequently, this case was assigned to the trial court.

On 12 April 2012, the trial court held a hearing for the purpose of considering the issues raised by Plaintiff's motion for the issuance of a

preliminary injunction. On 13 April 2012, Defendants filed an answer in which they denied the material allegations of Plaintiff's complaint and requested that the post-expiration restrictions in the franchise agreement be deemed invalid. On 14 May 2012, the trial court entered an order which prohibited Defendants from using, and requiring the return of, certain allegedly proprietary information, including customer-related information, manuals, and similar protected items. However, the trial court denied Plaintiff's request for the issuance of a preliminary injunction prohibiting the operation of Enlightened Lighting or any other outdoor lighting business. Plaintiff noted an appeal to this Court from the trial court's order.

## II. Legal Analysis

### A. Standard of Review

"A preliminary injunction is interlocutory in nature. As a result, issuance of a preliminary injunction cannot be appealed prior to final judgment absent a showing that the appellant has been deprived of a substantial right which will be lost should the order 'escape appellate review before final judgment.' " *Clark v. Craven Reg'l Med. Auth.*, 326 N.C. 15, 23, 387 S.E.2d 168, 173 (1990) (quoting *State ex rel. Edmisten v. Fayetteville Street Christian School*, 299 N.C. 351, 358, 261 S.E.2d 908, 913 (1980)) (citations omitted). "In reviewing the denial of a [request for the issuance of a] preliminary injunction, an appellate court is not bound by the trial court's findings of fact, but may weigh the evidence anew and enter its own findings of fact and conclusions of law; our review is *de novo*." *Kennedy v. Kennedy*, 160 N.C. App. 1, 8, 584 S.E.2d 328, 333, *appeal dismissed*, 357 N.C. 658, 590 S.E.2d 267 (2003). A reviewing court should uphold the issuance of a preliminary injunction "(1) if a plaintiff is able to show *likelihood* of success on the merits of his case and (2) if a plaintiff is likely to sustain irreparable loss unless the injunction is issued, or if, in the opinion of the Court, issuance is necessary for the protection of a plaintiff's rights during the course of litigation." *A.E.P. Industries, Inc. v. McClure*, 308 N.C. 393, 401, 302 S.E.2d 754, 759-60 (1983) (quoting *Investors, Inc. v. Berry*, 293 N.C. 688, 701, 239 S.E.2d 566, 574 (1977)).

### B. Likelihood of Success

[1] As a result of the fact that Defendants have not contended that Plaintiff would not be irreparably injured in the event that the issuance of the requested preliminary injunction were to be denied and the fact that Plaintiff would, in our opinion, be likely to establish the required irreparable injury if no such injunction were issued, we turn directly to

the issue of the likelihood that Plaintiff will succeed on the merits of its underlying claim. However, before explicitly discussing the enforceability of the relevant contractual provision, we must first address the level of scrutiny to which these contractual provisions should be subjected during the course of our analysis, a topic which the parties debated at length in their well-written and informative briefs.

## 1. Level of Scrutiny

In its brief, Plaintiff emphasizes the fact that the trial court referenced a number of cases arising from litigation over the validity of restrictions contained in an employment contract instead of relying exclusively on cases arising from the sale of a business.[2] In seeking the reversal of the trial court's order, Plaintiff urges us to adopt the standard generally utilized in cases arising from the sale of a business in evaluating the correctness of the trial court's order and contends that, in the event that we were to utilize the approach which it deems appropriate, the relevant contractual provisions would be deemed clearly enforceable. We do not find Plaintiff's argument persuasive.

According to well-established North Carolina law, non-competition agreements contained in an employment contract are "more closely scrutinized than" those contained in a contract for the sale of a business. *Keith v. Day*, 81 N.C. App. 185, 193, 343 S.E.2d 562, 567 (1986), *disc. review improvidently granted*, 320 N.C. 629, 359 S.E.2d 466 (1987). As the Supreme Court stated over half a century ago:

> A workman "who has nothing but his labor to sell and is in urgent need of selling that" may readily accede to an unreasonable restriction at the time of his employment without taking proper thought of the morrow, but a professional man who is the product of modern university or college education is supposed to have in his training an asset which should enable him adequately to guard his own interest, especially when dealing with an associate on equal terms.

*Beam v. Rutledge*, 217 N.C. 670, 673-74, 9 S.E.2d 476, 478 (1940). As a result, on the one hand, a non-competition agreement contained in an employment contract is enforceable if it is "(1) in writing; (2) reasonable as to time and territory; (3) made a part of the employment contract; (4) based on valuable consideration; and (5) designed to protect a legitimate

---

2. As an aside, we note that the trial court stated that the agreement at issue in this case should be invalidated under any of the standards presented for its consideration.

business interest of the employer." *Young v. Mastrom, Inc.*, 99 N.C. App. 120, 122-23, 392 S.E.2d 446, 448, *disc. review denied*, 327 N.C. 488, 397 S.E.2d 239 (1990) (citing *A.E.P. Indus.*, 308 N.C. at 402-03, 302 S.E.2d at 760). "The territory embraced by the restrictive covenant shall be no greater than is reasonably necessary to secure the protection of the business or good will of the employer." *Clyde Rudd & Assocs., Inc. v. Taylor*, 29 N.C. App. 679, 684, 225 S.E.2d 602, 605 (citing *Harwell Enterprises, Inc. v. Heim*, 276 N.C. 475, 478-79, 173 S.E.2d 316, 319 (1970)), *disc. review denied*, 290 N.C. 659, 228 S.E.2d 451 (1976). On the other hand:

> when one sells a trade or business and, as an incident of the sale, covenants not to engage in the same business in competition with the purchaser, the covenant is valid and enforceable (1) if it is reasonably necessary to protect the legitimate interest of the purchaser; (2) if it is reasonable with respect to both time and territory; and (3) if it does not interfere with the interest of the public.

*Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 662-63, 158 S.E.2d 840, 843 (1968).

A number of prior decisions in this jurisdiction dealing with the enforceability of agreements in which one person agrees to refrain from competing with another have involved situations which do not fit neatly into either the employer-employee category or the business sale category. In such situations, the North Carolina appellate courts have engaged in a detailed analysis of the reasonableness of the restrictions to which the plaintiff seeks to have the defendant subjected rather than attempting to determine on which side of the line separating the employer-employee context from the sale of a business context the case in question falls. As a result, although Plaintiff has invited us to adopt a bright-line rule subjecting post-expiration non-competition agreements contained in a franchise agreement to the same level of scrutiny as is typically applied in cases arising from the sale of a business, we are not willing to accept Plaintiff's invitation. Instead, we believe that the present case involves a hybrid situation which does not fit neatly within either of the categories posited in Plaintiff's brief. *E.g. Beam*, 217 N.C. at, 671, 9 S.E.2d at 477 (analyzing issues arising from the dissolution of a professional partnership); *Keith*, 81 N.C. App. at 186, 343 S.E.2d at 563 (analyzing issues arising from a venture capitalist's purchase of a franchise); *Starkings Court Reporting Servs., Inc. v. Collins*, 67 N.C. App. 540, 541, 313 S.E.2d 614, 615 (1984) (analyzing issues arising from a restrictive covenant entered into by an independent contractor). In arriving at this conclusion, we note that the franchisor-franchisee situation differs from both the

employer-employee and the sale of business contexts. On the one hand, a franchisee who ends his relationship with the franchisor is, more likely than not, an individual possessing a skill set that makes him capable of earning a livelihood in a variety of different businesses. For that reason, such a person is not as likely to be as dependent upon his ability to perform a specific type of work in a specific area as is the case with the typical employee. On the other hand, unlike the situation which typically arises from the sale of an established business, in which the seller has spent years building up good will in a particular area, a franchisor is likely to receive the benefit of at least some of the good will which was built up by the franchisee and has the ability to sell at least some portion of that accumulated good will to a new franchisee. These practical differences between the typical employer-employee arrangement and the typical buyer-seller arrangement preclude us from concluding that the rules that typically govern either arrangement should be applied with unbending rigidity in this situation.

As a result, in light of this determination, we conclude that elements of the tests utilized in both the employee-employer and the business sale context are relevant in analyzing the likelihood that Plaintiff will prevail in the present litigation. Among the factors that have been deemed relevant in evaluating the validity of non-competition agreements entered into in the employment context are:

> (1) the area, or scope, of the restriction, (2) the area assigned to employee, (3) the area in which the employee actually worked or was subject to work, (4) the area in which the employer operated, (5) the nature of the business involved, and (6) the nature of the employee's duty and his knowledge of the employer's business operation.

*Clyde Rudd & Assocs., Inc.*, 29 N.C. at 684, 225 S.E.2d at 605. After considering these factors, this Court invalidated a contractual provision that, "rather than attempting to prevent [the] plaintiff from competing for actuarial business, . . . appear[ed] to prevent plaintiff from working as a custodian for any 'entity' which provide[d] 'actuarial services.' " *Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C. App. 307, 317, 450 S.E.2d 912, 920 (1994), *disc. review denied*, 339 N.C. 612, 454 S.E.2d 251 (1995). Although the specific job description of the person sought to be restrained has been deemed less relevant when courts analyze a restriction placed on a business owner, we believe that the extent to which a particular contractual provision unreasonably impairs a former franchisee's ability to work in a related field or particular industry is relevant

to the reasonableness of a non-competition restriction arising from the termination of a franchise agreement.

Similarly, certain factors typically deemed relevant during the analysis of issues arising in the business sale context, while having little relevance in the employment context, have obvious bearing upon the proper resolution of disputes between franchisors and franchisees. For example, in the business sale context, North Carolina courts have frequently focused on issues relating to a business' good will. *See, e.g., Jewel Box Stores Corp.*, 272 N.C. at 663, 158 S.E.2d at 843 (recognizing that a business owner "acquires a property right in the good will of his patrons and that this property is not marketable 'unless the owner is at liberty to sell his right of competition to the full extent of the field from which he derives his profit and for a reasonable length of time' ") (quoting *Kramer v. Old*, 119 N.C. 1, 8, 25 S.E. 813, 813 (1896)). Unlike a former employee, a former franchisee is, in fact, likely to share the good will associated with the formerly franchised business as a result of the fact that the good will in question will have been generated by a combination of the efforts of the franchisor and the franchisee. As a result of the varying relevance of the factors typically deemed of utmost importance in the employer-employee and business sale contexts in the franchisor-franchisee context, we conclude that the ultimate issue which we must decide in resolving such disputes among franchisors and franchisees is the extent to which the non-competition provision contained in the franchise agreement is no more restrictive than is necessary to protect the legitimate interests of the franchisor, with the relevant factors to be considered in the making of this determination to include the reasonableness of the duration of the restriction, the reasonableness of the geographic scope of the restriction, and the extent to which the restriction is otherwise necessary to protect the legitimate interests of the franchisor. We will proceed to analyze the reasonableness of the restrictions at issue in this case in light of these criteria, utilizing those decisions addressing the specific issues under consideration in each portion of our analysis that we deem relevant without regard to the factual context from which those decisions arose.

## 2. Reasonableness of Restrictions

### a. Geographic Scope

In its brief, Plaintiff argues that the geographic scope of the restriction at issue in this case is reasonable. We do not, however, find this argument persuasive.

"The party who seeks the enforcement of the covenant not to compete has the burden of proving that the covenant is reasonable." *Hartman,* 117 N.C. App. at 311, 450 S.E.2d at 916. "The reasonableness of a noncompetition covenant is a matter of law for the court to decide." *Beasley v. Banks,* 90 N.C. App. 458, 460, 368 S.E.2d 885, 886 (1988). "To carry its burden[,] [the party seeking enforcement] must prove that the covenant not to compete is reasonable as to both time and territory." *Hartman,* 117 N.C. App. at 311, 450 S.E.2d at 916. The reasonableness of a geographic restriction contained in a non-competition agreement does not depend exclusively on the size of the area in question, *e.g. Harwell Enterprises, Inc.,* 276 N.C. at 481, 173 S.E.2d at 320 (holding that, "to a company actually engaged in nation-wide activities, nation-wide protection would appear to be reasonable and proper"); *Manpower of Guilford Cnty., Inc. v. Hedgecock,* 42 N.C. App. 515, 523, 257 S.E.2d 109, 115 (1979) (stating that, while an employer had no legitimate interest in preventing an employee "from competing with other Manpower franchisees in other cities or states . . . the [national] franchisor[] may have a legitimate right to prohibit its franchisees from competing with it or its affiliates throughout the country"); instead, the reasonableness of a geographic restriction depends upon where the business' "customers are located and [whether] the geographic scope of the covenant is necessary to maintain those customer relationships." *Hartman,* 117 N.C. App. at 312, 450 S.E.2d at 917.

The contractual language at issue here incorporates two separate geographical restraints, with the first prohibiting Mr. Harders from operating an outdoor lighting business within a 100-mile buffer surrounding the area in which OLP-NVA previously operated and the second prohibiting Mr. Harders from operating a particular type of business within the territory assigned to any of Plaintiff's franchisees or affiliates. More specifically, as originally written, section 14.2(b) of the franchise agreement provided that:

> Upon termination or expiration of the Initial Term or any Interim Period, or the transfer, sale or assignment of this Agreement by the Franchisee, neither the Franchisee, the operating manager or the Franchisee's owners will have any direct or indirect interest (i.e. through a relative) as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent, for two (2) years, in any Competitive Business within 100 miles of the Territory or any other franchisee's Franchisor's or Affiliates [sic] territory.

In apparent recognition of the problematic nature of the 100 mile buffer provision, Plaintiff filed an affidavit executed by Mr. Schroeder on 6 March 2012 indicating that it would not seek to enforce that portion of the non-competition agreement. The revised language created by Plaintiff's affidavit prohibited Mr. Harders from operating "any Competitive Business within the Territory or any other franchisee's Franchisor's or Affiliates['] territory."[3]

As this Court has previously stated, "[a] restriction as to territory is reasonable only to the extent it protects the legitimate interests of the employer in maintaining his customers." *Manpower of Guilford Cnty., Inc.*, 42 N.C. App. at 527 S.E.2d at 115. Although Plaintiff argued before the trial court that the non-competition provision which it sought to enforce in this case "includes all of the prescribed territory and the territory of other OLP franchises . . . [and] is necessary to protect the goodwill associated with OLP's trademarks and to prevent Defendants from trading on the goodwill generated in the OLP® Marks in this area over the last ten years," the actual language of the provision in question sweeps more broadly than Plaintiff's argument suggests. The relevant contractual language, even as modified in Mr. Schroeder's affidavit, prohibits Defendants from engaging in the outdoor lighting business within the territory assigned to any of Plaintiff's affiliates. According to the franchise agreement, the term "Affiliate" "means any person or entity that controls, is controlled by, or is in common control with, the Franchisor." As we have already noted, Plaintiff has two affiliates that are engaged in lines of business totally unrelated to outdoor lighting. Although Plaintiff argues that we should not consider the existence of these non-lighting affiliates in our analysis on the grounds that the relevant contractual language should not be read to preclude Defendants from competing with affiliates that did not exist at the time of the 2006 agreement, such as Mosquito Squad® and Archadeck®, the relevant contractual language does not provide any basis for inferring the existence of such a temporal limitation. Instead, the applicable contractual provision appears to be equally applicable to all of Plaintiff's affiliates and franchises. As a result, given that the non-competition provision contained in the

---

3. In view of the fact that section 14.5 of the franchise agreement gave Plaintiff "the right to reduce the scope of [section 14.2] without the Franchisee's consent, at any time or times, effective immediately upon notice to the Franchisee," it appears, given the language of the agreement, that Plaintiff had the right to modify the non-competition provision in this manner and exercised this authority in an appropriate manner. However, we need not determine the effectiveness of this exercise in private "blue penciling" given that the geographic scope of the remaining geographic restriction upon Defendants' activities remains unreasonably broad even if the buffer zone provision is excluded from our consideration.

franchise agreement prohibits Defendant from operating an outdoor lighting business in areas in which neither Plaintiff nor its franchisees or affiliates are engaged in similar activities, we conclude that such a restriction is excessively broad given that Plaintiff has no legitimate reason for precluding Defendants from competing with franchisees or affiliates of Plaintiff which are not engaged in the outdoor lighting business.

### b. Legitimate Business Interests

Secondly, Plaintiff contends that the non-competition provision contained in the franchise agreement did not preclude Defendants from engaging in an overly broad range of activities. According to Plaintiff, the trial court reached a contrary conclusion because it scrutinized the non-competition provision contained in the franchise agreement using the test appropriately utilized in the employer-employee context rather than that appropriately utilized in the business sale context and would have deemed the provision enforceable had it used the proper analytical framework in the course of making its decision. More specifically, Plaintiff argues that the trial court refused to enforce the non-competition provision at issue here because it "felt constrained to apply an extreme level of hypothetical analysis" even though courts should refrain from "dissect[ing] the language of [a] noncompete agreement to determine whether it could conceive of an interpretation that was over-broad" in non-employment contexts and should, instead, "ascertain the intentions of the parties and make a determination [as to] whether the defendant's conduct violates the terms of the applicable noncompete provision." We do not find this argument persuasive.

As a preliminary matter, Plaintiff argues that courts should focus on the intent underlying the non-competition agreement in question and refrain from giving any consideration to the plain language in which those agreements are couched in the event that a consideration of the agreement's literal language would extend the reach of the non-competition provision beyond permissible bounds. In seeking to persuade us of the merits of this position, Plaintiff relies on two Supreme Court decisions, neither of which support the position which it espouses. Plaintiff's reliance upon *Bicycle Transit Auth., Inc. v. Bell*, 314 N.C. 219, 333 S.E.2d 299 (1985), is misplaced given that those "defendants [did] not argue that the covenant as written [was] so broad in scope as to either interfere with the interests of the public or that it [was] not reasonably necessary to protect the legitimate interest of the purchaser" and argued instead that "under any reasonable interpretation of the covenant, [Defendant]'s acts did not rise to the level of a breach." 314 N.C. at 226, 333 S.E.2d at 304. Similarly, we are not persuaded by Plaintiff's

reliance on the Supreme Court's decision in *Beam*, which arose from a situation in which the defendant worked for the plaintiff, an ear, eye, nose, and throat specialist, and had entered into a non-competition agreement which prevented the defendant from practicing medicine within 100 miles of the town in which they practiced after dissolution of the partnership. *Beam*, 217 N.C. at 671, 9 S.E.2d at 477. According to Plaintiff, because "[n]owhere in the opinion is there any suggestion that the phrase 'the practice of the profession of medicine' was overbroad," we should infer that the Court approved the provision prohibiting the defendant from practicing medicine despite the specialized nature of the plaintiff's practice. Although the Supreme Court did uphold the enforceability of the non-competition agreement at issue in *Beam*, it did not specifically approve the language in question. *Id.* at 673-74, 9 S.E.2d at 478. Instead, the arguments advanced in *Beam* revolved around public policy considerations instead of a detailed analysis of the specific language contained in the non-competition agreement. As a result, we do not believe that it would be appropriate for us to read either of the decisions upon which Plaintiff relies as an invitation to ignore the language of the non-competition agreement contained in the franchise agreement[4] and will, for that reason, focus our attention on the language which the non-competition provision of the franchise agreement utilizes to define the scope of the activities from which Defendants are prohibited from engaging.

According to the Supreme Court:

> [T]he goal of [contract] construction is to arrive at the intent of the parties when the [contract] was issued. Where a [contract] defines a term, that definition is to be used. If no definition is given, non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended. The various terms of the [contract] are to be harmoniously construed, and if possible, every word and every provision is to be given effect.

---

4. Assuming that Plaintiff has, however, read *Beam* correctly, the facts at issue in that case are significantly different from the facts which we have before us here. We are loath to treat a case involving a dispute between physicians as analogous to a dispute between entities competing in the outdoor lighting business given the fact that physicians have the authority to practice medicine, rather than simply engage in a particular specialty, and given that the relationship between a physician and his or her patients is very different than the relationship between an outdoor lighting business and its customers. As a result, we cannot read *Beam* as enunciating a general rule requiring courts to focus on what the parties claim to have intended rather than the language in which their agreement is couched.

*Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 629, 588 S.E.2d 871, 875 (2003) (quoting *Gaston Cnty. Dyeing Machine Co. v. Northfield Ins. Co.*, 351 N.C. 293, 299, 524 S.E.2d 558, 563 (2000)) (alterations in original). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract," so that, "[i]f the language is clear and only one reasonable interpretation exists, the courts must enforce the contract as written." *Hodgin v. Brighton*, 196 N.C. App. 126, 129, 674 S.E.2d 444, 446 (2009) (citations and quotation marks omitted).

Section 14.2(b) of the franchise agreement specifically prohibits Defendants from having an involvement "for two (2) years, in any Competitive Business." The agreement defines "Competitive Business" as "any business operating in competition with an outdoor lighting business or any business similar to the Business [] as carried on from time to time during the Initial Term of this Agreement" and defines "Business" as "the business operations conducted or to be conducted by the Franchisee consisting of outdoor lighting design and automated lighting control equipment and installation services, using the Franchisor's System and in association therewith the Marks." As a result of the fact that the contractual language in question is couched in disjunctive terms, the non-competition agreement prohibits Defendants from both involvement in any business "operating in competition with an outdoor lighting business" and "any business similar to the Business" regardless of the extent to which either type of entity actually competes with Plaintiff. After carefully studying the record, we are unable to see how prohibiting Defendants from having any involvement in any business "operating in competition with an outdoor lighting business" or any business "similar" to the one Mr. Harders operated as an OLP franchisee is necessary to protect any of Plaintiff's legitimate business interests. On the contrary, we believe that the restriction in question goes well beyond the prohibition of activities that would put Defendants in competition with Plaintiff. For example, Mr. Harders would be prohibited from owning a franchise that sold and maintained indoor lighting or from obtaining employment at a major home improvement store that sold outdoor lighting supplies, equipment, or services as a small part of its business even if he had no direct involvement in that retailer's outdoor lighting operations.[5] We do not believe that our concerns about the scope of the restrictions upon Defendants' future activities result from an exercise

_____

5. According to Mr. Harders' affidavit, Plaintiff informed him that he could not work for a wholesale supplier of outdoor lighting or open an indoor lighting business without violating the non-competition provisions of the franchise agreement.

in an "extreme level of hypothetical analysis;" instead, our concerns are derived directly from the literal language of the contract provision which Plaintiff is seeking to enforce. As a result, we conclude that the non-competition agreement at issue here would prevent Defendants from engaging in activities that have no tendency to adversely affect Plaintiff's legitimate business interests.

In *Hartman*, this Court considered a non-competition agreement that prevented an employee from owning any "entity providing actuarial services or any other services of the same nature as the service currently offered by the Corporation to the insurance industry and others or otherwise compete against the Corporation in the actuarial or consulting business" in "every city (whether or not [the] defendant did business there) in eight states for five or more years." 117 N.C. App. at 308, 314, 450 S.E.2d at 914-15, 918. In the course of holding that the agreement in question was unenforceable, we noted that the provision in question "purport[ed] to preclude the plaintiff from working with any actuarial business in North Carolina . . . even if the business by which he was engaged did not service any customers located in the eight states" and "prohibit[ed] plaintiff from working for any business that provides actuarial services, without reference to whether or not that business competes with defendant." *Id.* at 316-17, 450 S.E.2d at 919-20.[6] In like manner, we are unable to uphold the enforceability of the non-competition agreement given that, according to the plain language in which it is couched, it prohibits Defendants from engaging in lawful activities which do not impinge upon Plaintiff's legitimate business interests in any meaningful way. As a result, given that the geographic scope of the non-competition agreement at issue in this case is impermissibly broad and that the agreement prohibits Defendants from engaging in activities which do not involve an impermissible degree of competition with Plaintiff's legitimate business interests, we conclude that the trial court correctly determined that the Plaintiff had no likelihood of success on this particular claim on the merits and that Plaintiff's preliminary injunction motion should be denied.[7]

---

6. Although Plaintiff urges us to "blue pencil" the non-competition agreement to the extent necessary to render it enforceable, it has not, with the exception of the 100-mile buffer provision discussed above, pointed to any specific provision which we should excise using any available "blue penciling" authority. In view of the fact that "[i]t is not the role of the appellate courts . . . to create an appeal for an appellant," *Viar v. N.C. Dept. of Trans.*, 359 N.C. 400, 402, 610 S.E.2d 360, 361 (2005), we decline to take Plaintiff up on its nonspecific suggestion that we "blue pencil" any provision that we believe stands in the way of the enforcement of the non-competition provision contained in the franchise agreement.

7. Although Plaintiff has also argued that the duration of the restriction in question

### III. Conclusion

Thus, for the reasons set forth above, we hold that the trial court correctly determined that Plaintiff was unlikely to prevail in its attempt to obtain enforcement of the non-competition agreement contained in the franchise agreement. As a result, the trial court's order should be, and hereby is, affirmed.

AFFIRMED.

Judges BRYANT and ELMORE concur.

---

was reasonable, we need not address this issue given that the non-competition agreement in question is unenforceable regardless of the reasonableness of the duration provision included in that agreement.