KNC Techs., LLC v. Tutton, 2019 NCBC 71.

STATE OF NORTH CAROLINA

DAVIDSON COUNTY

KNC TECHNOLOGIES, LLC, f/k/a
KEN-NECT COMMUNICATIONS,
L.L.C.,

          Plaintiff,

    v.

ERIC TUTTON and I-TECH
SECURITY & NETWORK
SOLUTIONS, LLC,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 793

**ORDER AND OPINION ON
DEFENDANTS' MOTION TO DISMISS**

THIS MATTER comes before the Court upon Defendants' Motion to Dismiss. ("Motion", ECF No. 5.)

THE COURT, having considered the Motion, the briefs filed in support of and in opposition to the Motion, the arguments of counsel at the hearing on the Motion, and other appropriate matters of record, concludes that the Motion should be GRANTED, in part, and DENIED, in part, for the reasons set forth herein.

I.     FACTS[1]

1.     Plaintiff, KNC Technologies, LLC, formerly known as Ken-Nect Communications, L.L.C., ("KNC") is in the business of installing low-voltage infrastructure primarily for communications and safety applications. Defendant Eric Tutton ("Tutton") was employed by KNC as a project manager, most recently from

---

[1] The facts recited herein are drawn from the Complaint and the attachments incorporated into the Complaint. ("Complaint", ECF No. 3.)

November 19, 2012 until November 14, 2013. (ECF No. 3, at ¶ 7.) Tutton executed a non-compete and non-solicitation agreement with KNC ("Non-compete Agreement") (*Id.*; ECF No. 3 at Ex. 1, Ex. A.) The Non-compete Agreement prohibited Tutton from working for KNC's competitors for a period of three years following Tutton's termination from KNC and prohibited him from disclosing KNC's trade secrets and confidential information. (*Id.* at ¶ 6–7; ECF No. 3 at Ex. 1, Ex. A.)

2. On November 14, 2013, Tutton resigned his employment with KNC and began working for Nitor Solutions, Incorporated ("Nitor"), a competitor of KNC. Tutton admits that in October and November 2013, prior to his resignation from KNC, he helped Nitor download "files containing KNC's customer and supplier information, pricing schemes, project plans and designs, estimates, and bids." (ECF No. 3 at Ex. 1, ¶¶ 7–26.) After Tutton began working for Nitor, he contacted KNC's customers and helped Nitor successfully solicit business from those customers. (*Id.* at ¶¶ 31–40.)

3. KNC subsequently sued Tutton for breach of the Non-compete Agreement in Forsyth County Superior Court (*Ken-Nect Communications, L.L.C. v. Eric Tutton*, 13-CVS-07572; "*Tutton I*"), claiming, *inter alia*, that Tutton provided KNC's confidential business information to Nitor. In September 2014, KNC and Tutton settled *Tutton I* by executing a Confidential Waiver, Release, and Settlement Agreement ("Settlement Agreement"). (ECF No. 3, at ¶ 11; Settlement Agreement, ECF No. 3 at Ex. 2.) The Settlement Agreement provided that Tutton would pay $5,000.00 to KNC and that KNC would release all claims against Tutton and dismiss

*Tutton I*.  (ECF No. 3 at Ex. 2, pp. 1–2.)   In addition, Tutton also agreed to the entry against him of an injunction by the Court prohibiting Tutton, for a period of ten years, from: directly or indirectly soliciting, contacting, and/or making sales to KNC's customers or to a specific list of eight of KNC's vendors and suppliers; retaining or using KNC's trade secrets, confidential and proprietary information; and disparaging or defaming KNC.  (ECF No. 3 at Ex. 2, p. 2.)

4.      On September 17, 2014, the Forsyth County Superior Court entered a Consent Order for Permanent Injunction and Dismissal of Remaining Claims and Counterclaims (the "Consent Order").  (ECF No. 3, at Ex. 3.)  The Consent Order contained the following prohibitions on Tutton's activities relevant to the Motion:

a. [Tutton] is prohibited and enjoined from indirectly or directly soliciting[,] contacting, and/or making sales to any customers of [KNC].

b. The term "Customers" as used herein shall mean any party for whom [KNC] had provided services as of November 14, 2013.

c. [Tutton] is prohibited and enjoined from indirectly or directly soliciting, contacting, and/or making sales to any Suppliers of [KNC].

d. The term "Suppliers" as used herein shall mean Accu-Tech Corporation, ADI, Anixter, Inc., Communications Supply Corporation, Graybar Electric Company, Blackboard, Black Box, Norfolk Wire, and ScanSource and their operations in North Carolina, Virginia, South Carolina, Tennessee, and Georgia.

(ECF No. 3 at Ex. 3, p. 2.)  The Consent Order further provided that it would "dissolve automatically on August 31, 2024," and that "[Tutton] waives any and all rights to seek modification to or relief from its terms until its natural expiration."  (*Id*. at p. 3.)

5. In April 2015, Tutton formed Defendant I-Tech Security & Network Solutions, LLC, ("I-Tech"; collectively, Tutton and I-Tech are referred to as "Defendants"). I-Tech performs many of the same services as, and competes with, KNC. (ECF No. 3, at ¶ 15.)

6. In June 2018, Tutton, through I-Tech, directly solicited KNC's customer, Guilford County Schools, for at least two projects. (*Id*. at ¶ 16; ECF No. 3 at Ex. 4.) I-Tech was unsuccessful on these solicitations and the projects were awarded to KNC. (ECF No. 3 at Ex. 4.) I-Tech also "solicited, contacted, or engaged in sales with" several of KNC's specific suppliers and vendors listed in the Consent Order. (*Id*. at ¶¶ 15–17.) Finally, KNC alleges, "upon information and belief," that Tutton and I-Tech have used KNC's trade secrets and confidential and proprietary information. (*Id*. at ¶ 19.) KNC alleges that Tutton's conduct violated the Settlement Agreement and Consent Order. (*Id*. at ¶¶ 15–19.)

7. On April 9, 2019, KNC filed the Complaint in this lawsuit. (ECF No. 3.) The Complaint alleges claims against Tutton and I-Tech for: breach of the Settlement Agreement and Consent Order (First and Second Claim for Relief); Misappropriation of Trade Secrets (Fifth Claim); unfair and deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1 ("UDTPA") (Sixth Claim); and Unjust Enrichment (Seventh Claim); and a claim for Tortious Interference against I-Tech (Third Claim). The Complaint also requests that the Court disregard I-Tech's corporate form and hold I-Tech "jointly and severally responsible for Tutton's conduct," (Fourth Claim, ECF No. 3, at ¶¶ 38–43), and "impose a constructive trust and direct Defendants to disgorge

all profits gained from the violation of the terms of the Settlement Agreement and Consent Order." (Eighth Claim, *Id.* at ¶¶ 59–63.)

8. On May 9, 2019, Defendants filed their Answer, Motion to Dismiss, and Affirmative Defenses, and a Memorandum in Support of Motion to Dismiss. (ECF No. 5; Mem. Supp. Mot. to Dismiss, ECF No. 6.) KNC filed a Brief in Opposition to Defendants' Motion to Dismiss, (Br. In Opp. Mot. to Dismiss, ECF No. 15), and Defendants' filed a Reply Brief in Support of Motion to Dismiss. (Reply Br. Supp. Mot. Dismiss, ECF No. 16.)

9. The Court held a hearing on the Motion on July 31, 2019 at which counsel for the parties made oral argument. The Motion is now ripe for decision.

## II. ANALYSIS

### A. Standard of Review

10. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory, whether properly labeled or not." *Harris v. NCNB Nat'l Bank,* 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). North Carolina is a notice pleading state. *See, e.g., Feltman v. City of Wilson*, 238 N.C. App. 246, 252, 767 S.E.2d 615, 620 (2014) (quoting *Wake Cty. v. Hotels.com, L.P.,* 235 N.C. App. 633, 646, 762 S.E.2d 477, 486 (2014)). "Under notice pleading, a statement of claim is adequate if it gives sufficient notice of the claim asserted to enable the adverse party to answer and prepare for

trial, to allow for the application of the doctrine of res judicata, and to show the type of case brought." *Id.*

11. "It is well established that dismissal pursuant to Rule 12(b)(6) is proper when '(1) the complaint on its face reveals that no law supports the plaintiff's claim; (2) the complaint on its face reveals the absence of facts sufficient to make a good claim; or (3) the complaint discloses some fact that necessarily defeats the plaintiff's claim.'" *Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 615, 821 S.E.2d 729, 736–37 (2018) (quoting *Wood v. Guilford County*, 355 N.C. 161, 166, 558 S.E.2d 490, 494 (2002)).

12. In deciding a motion to dismiss, the court must construe the complaint liberally and accept all well-pleaded allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). The court, however, is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005) (citation and quotations omitted).

13. "[W]hen ruling on a Rule 12(b)(6) motion, a court may properly consider documents which are the subject of a plaintiff's complaint and to which the complaint specifically refers even though they are presented by the defendant." *Oberlin Capital, L.P. v. Slavin*, 147 N.C. App. 52, 60, 554 S.E.2d 840, 847 (2001).

14. Applying these standards, the Court will address each of Plaintiff's claims in turn.

## B. Breach of Contract

15.     In its first claim, KNC alleges that the Settlement Agreement and Consent Order are enforceable contracts, and that Tutton violated the contracts. (ECF No. 3, at ¶¶ 20–24.)  Specifically, KNC alleges that Tutton violated the terms of the Consent Order by calling on KNC's customers, contacting KNC's suppliers, and using KNC's trade secrets.  (*Id.* at ¶¶ 16–19.)

16.     Preliminarily, the parties raise several novel issues that must be addressed prior to deciding whether KNC has sufficiently pleaded its breach of contract claim.   Defendants contend that the restrictions on Tutton's activities contained in the Settlement Agreement and Consent Order should be analyzed as a restrictive covenant between an employer and employee.   Analyzed as such, Defendant argues the restrictions are unenforceable under North Carolina law because: (1) they are overbroad; and (2) violate public policy.  (ECF No. 6, at pp. 9–14.)  KNC counters that Defendants' arguments that the Consent Order is overbroad and against public policy are an impermissible collateral attack on a "duly rendered judgment issued by the Superior Court sitting in Forsyth County."  (ECF No. 15, at p. 4–5.)  The Court will address each issue raised by Defendants and KNC prior to analyzing the sufficiency of KNC's pleading on its breach of contract claim.

> *i. Defendants' arguments for dismissal of the claim for breach of the Consent Order are not a collateral attack.*

17.     KNC argues that Defendants' arguments against enforcement of the Consent Order are a collateral attack on a final judgment. (ECF No. 15, at pp. 4–5.) "A collateral attack on a judicial proceeding is 'an attempt to avoid, defeat, or evade

it, or deny its force and effect, in some incidental proceeding not provided by law for the express purpose of attacking it. North Carolina does not allow collateral attacks on judgments." *Reg'l Acceptance Corp. v. Old Republic Sur. Co.,* 156 N.C. App. 680, 682, 577 S.E.2d 391, 392 (2003) (quoting *Hearon v. Hearon,* 44 N.C. App. 361, 362, 261 S.E.2d 9, 10 (1979)).

18. Implicit in North Carolina's rule on collateral attacks is the notion that there must first be a "judgment" that can be attacked. *See Pinewood Homes, Inc. v. Harris,* 184 N.C. App. 597, 602, 646 S.E.2d 826, 831 (2007) (holding that there was no "judgment" as required by the rule against collateral attacks when the preliminary injunction at issue had been voided); *Clayton v. N.C. State Bar*, 168 N.C. App. 717, 719, 608 S.E.2d 821, 822 (2005) (concluding that when no appeal was taken, the trial court's order became final and not subject to collateral attack.). In North Carolina, "[a] final judgment is one which disposes of the cause as to all the parties, leaving nothing to be judicially determined between them in the trial court." *CBP Resources, Inc. v. Mountaire Farms, Inc.,* 134 N.C. App. 169, 171, 517 S.E.2d 151, 154 (1999).

19. KNC relies on *Price v. Dobson*, 141 N.C. App. 131, 134, 539 S.E.2d 334, 336 (2000), to support its position that a consent judgment, like the Consent Order is a "final determination of the rights adjudicated therein." (ECF No. 15, at p. 5.) On that premise, KNC contends that the Consent Order is capable of being collaterally attacked. (*See id.*) Under North Carolina law, "[a] consent judgment is the contract of the parties entered upon the record with the sanction of the court. Thus, it is both an order of the court and a contract between the parties." *Potter v. Hilemn Labs.,*

*Inc.*, 150 N.C. App. 326, 334, 564 S.E.2d 259, 265 (2002) (internal citations omitted). However, where a consent judgment does not contain findings of fact or conclusions of law by the trial court, and "merely recite[s] the parties' settlement agreement," it does "not represent an adjudication of the parties' respective rights," and cannot be enforced through the court's contempt powers. *Ibele v. Tate*, 163 N.C. App. 779, 781, 594 S.E.2d 793, 795 (2004) (citation omitted); *see also Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) ("A consent judgment is a court-approved contract"); *In re Will of Smith*, 249 N.C. 563, 568–569, 107 S.E.2d 89, 93–94 (1959) (The "consent judgment . . . [was] nothing more than a contract," and could not be enforced by contempt proceeding.).

20.    KNC's argument that Defendants' objections to the Consent Order amount to a collateral attack, while intriguing, is ultimately unavailing. Close review of the Consent Order reveals that the Forsyth County Superior Court made no findings of fact or conclusions of law. (*See* ECF No. 3 at Ex. 3.) The court simply incorporated the facts by reference from KNC's verified complaint and various affidavits, (ECF No. 3 at Ex. 3, p. 1), and stated that "Defendant disputes and denies the allegations made by Plaintiff" without making any of its own findings of fact. (*Id.* at p. 2.) Moreover, the court provided that the "Parties have waived any further findings of fact and conclusions of law." (*Id.*)

21.    The Court concludes that the Consent Order at issue in this case is merely a recitation of the parties' Settlement Agreement and therefore does not represent an adjudication of the parties' rights. Accordingly, the Court is bound by

North Carolina's appellate jurisprudence to treat the Consent Order as a contract and not a final judgment capable of being collaterally attacked.

*ii. The Consent Order should not be analyzed as an employee-employer non-compete.*

22. The Court next addresses Defendants' argument that the restrictive covenants in the Consent Order are unenforceable under North Carolina law. (ECF No. 6, at pp. 9–10.) Defendants contend that the Consent Order should be treated as a non-compete agreement between an employer and employee and analyzed under the well-established standard applied to such agreements: (1) an enforceable non-compete agreement between an employer and employee must be in writing; (2) made a part of the employment contract; (3) based on valuable consideration; (4) reasonable as to time and territory; and (5) designed to protect a legitimate business interest of the employer. (ECF No. 6, at p. 9; citing *Hartman v. WH Odell and Assocs., Inc.*, 117 N.C. App. 307, 311, 450 S.E.2d 912, 916 (1994).) Applying this standard, Defendants argue that the time of the restrictions contained in the Consent Order of nearly 10 years is unreasonable as a matter of law and is unenforceable. (*Id.* at pp. 9–10.) In support, Defendants cite to North Carolina authority finding that, generally, 5 years is the outer limit of reasonableness for a restrictive covenant imposed on an employee. (*Id.*; citing e.g., *Farr Assocs., Inc. v. Baskin*, 138 N.C. App. 276, 282, 530 S.E.2d 878, 881 (2000).)

23. KNC, on the other hand, argues that the restrictive covenants in the Consent Order are not subject to North Carolina precedent regarding employer-employee non-compete agreements, but instead should be enforced simply as the

product of an arms-length settlement of *Tutton I*.  (ECF No. 15, at pp. 10–12.)  KNC contends that the agreement in this case differs significantly from restrictive covenants between employers and employees, for which "it is entirely appropriate for a court to review the enforceability of those agreements to make sure the agreements were in accord with North Carolina law and that an employer did not take advantage of an employee by forcing the employee to execute an overly broad or unduly restrictive agreement." (*Id*. at p. 11.)  Rather, the restrictions on Tutton's activities in this case were the product of a negotiated compromise between parties represented by counsel of "a pending lawsuit, brought by KNC against a former employee who [ ] admitted, under oath, to the theft of trade secrets." (*Id*.)  Plaintiff contends that "applying the employee non-competition standards to the Settlement Agreement and [Consent] Order also would frustrate North Carolina's interests in having legal disputes resolved by settlement prior to trial." (*Id*.)

24.    "At common law, non-competition clauses generally were not upheld because such agreements were held to be in restraint of trade and thus against public policy." *United Labs., Inc v. Kuykendall,* 322 N.C. 643, 648, 370 S.E.2d 375, 379 (1988).  However, over time it became widely accepted by North Carolina's courts that "while non-competition clauses were in partial restraint of trade, they would nevertheless be upheld if the covenants were supported by valuable consideration, reasonably necessary to protect the interests of the covenantee, and not against public policy." *Id.*  (citing *Hill v. Davenport*, 195 N.C. 271, 141 S.E. 752 (1928)).  North Carolina courts will enforce restrictive covenants entered into between employers and

employees where the restrictions on the employee's activities are reasonably necessary to protect an employer's legitimate business interests. *See Outdoor Lighting Perspectives Franchising v. Harders,* 228 N.C. App. 613, 620–21, 747 S.E.2d 256, 262 (2013).

26. In addition to the employee-employer context, North Carolina has another line of cases—the buyer-seller of a business situation—occupying the field of non-compete agreements:

> [W]hen one sells a trade or business and, as an incident of the sale, covenants not to engage in the same business in competition with the purchaser, the covenant is valid and enforceable (1) if it is reasonably necessary to protect the legitimate interest of the purchaser; (2) if it is reasonable with respect to both time and territory; and (3) if it does not interfere with the interest of the public.

*Id.* at 621, 747 S.E.2d at 262. (citation omitted). While the outer limit of reasonableness for employment non-competes generally will not extend beyond 5 years, the same does not hold true in the sale of a trade or business context. *See Jewel Box Stores Corp. v. Morrow*, 272 N.C. 659, 664, 158 S.E.2d 840, 843–44 (1968) (citing numerous cases in which covenants not to compete ranging from ten years to life were upheld when accompanied with the sale of a business).

26. While the law in North Carolina regarding these traditional categories of non-competes is robust, "[a] number of prior decisions . . . dealing with the enforceability" of non-compete agreements "involved situations which do not fit neatly into either the employer-employee category or the business sale category." *Outdoor Lighting*, 228 N.C. App. at 621, 747 S.E.2d at 262. "[P]ractical differences

between the typical employer-employee arrangement and the typical buyer-seller arrangement" render it illogical to conclude that the rules "typically govern[ing] either arrangement should be applied with unbending rigidity." *Id.* at 622, 747 S.E.2d at 263.

27. In *Outdoor Lighting,* the court declined to accept plaintiff's argument that a non-compete agreement between a franchisor and franchisee should be analyzed solely under the employer-employee rubric. *Id.* at 621–22, 747 S.E.2d at 263. The court concluded that the franchisor-franchisee relationship was a "hybrid situation" differing from both employer-employee and buyer-seller context and did not fit neatly into either category. *Id.* at 621, 747 S.E.2d at 263. The court noted specific, key differences between the franchisor-franchisee situation and more commonly litigated non-compete disputes. *Id.* at 621–22, 747 S.E.2d at 263. Namely, as compared to the employer-employee situation, a franchisee likely possesses more marketable skills than a typical employee and is not dependent on one particular craft to earn a living. *Id.* at 622, 747 S.E.2d at 263. Unlike the buyer-seller situation, a franchisor is likely to benefit from the goodwill built up by the franchisee when the franchisor sells the business to another franchisee. *Id.*

28. In *Outdoor Lighting*, the court elected to utilize elements of both the employer-employee and the buyer-seller categories when analyzing the non-compete in the franchisor-franchisee context. *Id.* After assessing the varying degrees of relevance of the factors in the employer-employee and buyer-seller context, the court concluded that: "the ultimate issue . . . in resolving such disputes . . . is the extent to

which the non-competition provision . . . is no more restrictive than necessary . . . with relevant factors to include . . . duration . . . geographic scope . . . and the extent to which the restriction is otherwise necessary to protect the legitimate interests of the franchisor." *Id.* at 623, 747 S.E.2d at 264.

29. The Court concludes that the facts alleged in this case do not fit squarely under the analysis applied to restrictive covenants between employer and employee or buyer and seller, but instead call for a more situation-specific approach. Therefore, like the court in *Outdoor Lighting,* the Court declines to adopt Defendants' assertion that the restrictive covenant in the Consent Order should be treated as an employer-employee non-compete.

30. Ultimately, "the reasonableness of a restraining covenant is a matter of law for the court to decide." *Jewel Box Stores Corp.,* 272 N.C. at 663, 158 S.E.2d at 843 (1968) (citation omitted). "Essentially, 'by enforcing the restrictions [a] court is only requiring the defendants to do what they agreed to do.'" *United Labs., Inc,* 322 N.C. at 649, 370 S.E.2d at 380 (noting that at the time the parties entered into the contracts containing the covenants not to compete, both parties "regarded the restrictions as reasonable and desirable") (citation omitted).

31. On these facts, the Court is compelled to find that the ten-year duration of the covenant in the Consent Order is reasonable and enforceable. Tutton admittedly violated the Non-compete Agreement after his resignation from KNC. KNC brought a lawsuit against Tutton and the lawsuit was settled prior to trial, in part, because Tutton agreed to a set of narrowly-tailored restrictions on his ability to

solicit KNC's customers and vendors for approximately ten years. Tutton is not prohibited from competing with KNC. Rather, he is restricted only from soliciting, contacting, or making sales to KNC's customers and to eight of KNC's vendors and suppliers and using Plaintiff's "trade secrets, confidential and proprietary information." "While the law frowns upon unreasonable restrictions, it favors the enforcement of contracts intended to protect legitimate interests." *Sonotone Corp. v. Baldwin*, 227 N.C. 387, 390, 42 S.E.2d 352, 355 (1947). The restrictions in the Consent Order do nothing more than protect KNC's business interests, which Tutton has already demonstrated a propensity to ignore. Therefore, the Court finds that the non-compete contained in the Consent Order is valid, reasonable, and enforceable.

*iii. The restrictions in the Consent Order do not violate public policy.*

32. Defendants further contend that the Consent Order and "the Settlement Agreement[ ] cannot be enforced to prohibit Defendants' solicitation of business from [Guilford County Schools], or [Guilford County Schools]'s solicitation of business from Defendants. Such a prohibition would constitute a violation of public policy." (ECF No. 6, at p. 12.) Defendants summarize their argument as follows:

> North Carolina state statutes and policies require local governments to use competitive bidding for (1) purchase contracts . . . . *See* N.C. Gen. Stat. §§ 143-129, -131. The purpose of competitive bidding laws is "to prevent favoritism, corruption, fraud, and imposition in the awarding of public contracts by giving notice to prospective bidders and thus assuring competition which in turn guarantees fair play and reasonable prices in contracts involving the expenditure of a substantial amount of public money." *Mullen v. Town of Louisburg*, 225 N.C. 53, 58–59, 33 S.E.2d 484, 487 (1941).

(*Id.*)

33.     Defendants' argument is misplaced.  The public policy at issue requires *local government entities* to use open and competitive bidding processes in awarding government contracts to assure both that the government is receiving cost-efficient bids and to protect against contracts being awarded on the basis of favoritism or on other improper grounds.  That public policy does not prohibit a private party from voluntarily removing itself from bidding on such contracts by settlement agreement or otherwise.

34.     "[C]ourts must be cautious when addressing arguments based on 'public policy.'"  *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *24 (N.C. Super. Ct. Nov. 3, 2011) (citation omitted).  The premise behind refusing to enforce contracts that are in breach of public policy is rooted in the notion "that no one can rightfully do 'that which tends to injure the public or is detrimental to the public good.'"  *Vogel v. Reed Supply Co.,* 277 N.C. 119, 133, 177 S.E.2d 273, 282 (1970) (quoting *A. C. Frost & Co. v. Coeur D'Alene Mines Corp.*, 312 U.S. 38 (1940)).  Even so, "if it definitely appears that enforcement of a contract will not be followed by injurious results, then, generally at least, what the parties have agreed to ought not to be struck down on the ground of public policy."  *Id.* at 133–34, 177 S.E.2d at 282 (citation and quotations omitted).  Here, the Court is unpersuaded by Defendants' argument that the prohibitions in the Settlement Agreement and Consent Order cause any injury to the public good.  The Settlement Agreement and Consent Order do not limit Guilford County Schools' ability to use competitive

bidding processes. Guilford County Schools, and any other governmental customers of KNC, are free to solicit bids from whomever they please. The restriction at issue here merely prohibits Tutton, a single market participant, from soliciting business with Guilford County Schools for a limited period of time. Likewise, the Consent Order does not prevent Guilford County Schools from securing competitive bids, it only prevents Tutton from being one of the bidders. Therefore, the Customer Provision is not unenforceable for being in contravention to public policy.

> *iv. Whether the liquidated damages provision of the Settlement Agreement is reasonable is question of fact.*

35. Finally, Defendants contend that the liquidated damages provision in the Settlement Agreement cannot be enforced because it constitutes an impermissible penalty. (ECF No. 6, at pp. 14–15.) The Settlement Agreement provides, in relevant part, as follows:

> If at any time it is determined that Tutton has breached the terms of the Permanent Injunction to be entered by the Court pursuant to this Agreement, Tutton acknowledges and agrees that Ken-Nect shall be entitled to a payment of liquidated damages in the amount of Twenty-Five Thousand and No/100 Dollars ($25,000.00) per violation.

(ECF No. 3 at Ex. 2, ¶ 6.)

36. Defendants argue that the liquidated damages amount of $25,000.00 per violation bears no reasonable relationship to the amount of actual damages KNC would suffer in the event of a breach of the restrictive covenants in the Consent Order and, therefore, are an unlawful penalty. (ECF No. 6, at p. 15.) In support of their

argument Defendants rely on *Knutton v. Cofield*, 273 N.C. 355, 361, 160 S.E.2d 29, 34 (1968), which held:

> *Liquidated damages* are a sum which a party to a contract agrees to payor a deposit which he agrees to forfeit, if he breaks some promise, and which, having been arrived at by a good-faith effort to estimate in advance the actual damage which would probably ensue from the breach, are legally recoverable or retainable . . . if the breach occurs. A *penalty* is a sum which a party similarly agrees to pay or forfeit . . . but which is fixed, not as a pre-estimate of probable actual damages, but as a *punishment*, the threat of which is designed to prevent the breach, or as *security* . . . to insure that the person injured shall collect his actual damages.

*Id.* (quotations and citation omitted).

37. Plaintiff argues that Defendants' attack on the liquidated damages provision is premature. (ECF No. 15, at pp. 15–16.) The Complaint does not contain any allegations regarding how the parties arrived at the $25,000.00 figure, and Plaintiff contends that the reasonableness of that figure cannot be determined prior to conducting discovery. (*Id.*; citing *Green Park Inn, Inc. v. Moore*, 149 N.C. App. 531, 540, 562 S.E.2d 53, 59 (2002) ("Whether a liquidated damages amount is a reasonable estimate of the damages that would likely result from a default is a question of fact.").)

38. Although the Court is skeptical that the $25,000.00 figure will prove reasonable, at least with regard to certain types of violations of the Consent Order, it agrees with Plaintiff's argument and concludes that it should not decide the question

at this preliminary stage of the case. Accordingly, Defendants' motion to dismiss the liquidated damages provision in the Settlement Agreement is DENIED.

> *v. KNC does not allege Tutton has breached the Consent Order and Settlement Agreement by competing generally with KNC.*

39. Defendants argue that Tutton and I-Tech's competition with KNC is not a breach of the Consent Order because there is nothing in the Consent Order preventing Tutton from competing, generally, with KNC. (ECF No. 6, at pp. 10–11.) However, Plaintiff concedes that "KNC has not and is not making a claim that I-Tech and Mr. Tutton's general competition with KNC is by itself sufficient to demonstrate a breach of the Settlement Agreement and Consent Order." (ECF No. 15, at p. 13.) Therefore, the Court need not address this argument.

> *vi. KNC has alleged a claim for breach of contract against Tutton.*

40. In addition, Defendants argue that KNC has failed to provide anything beyond conclusory allegations to support its claim that Tutton violated the prohibition on contacting or soliciting KNC's vendors and suppliers. (ECF No. 6, at p. 11–12.)[2]

41. A breach of contract claim is comprised of two elements: "(1) [the] existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000). Here, KNC has alleged the existence of valid contracts—the Settlement Agreement and Consent Order. KNC also alleges that "Tutton . . . has solicited, contacted, or engaged in sales with . . .

---

[2] Defendants do not argue that the breach of contract claim against Tutton should be dismissed because KNC failed to allege that Tutton solicited KNC's customers, only that the allegations regarding Tutton's solicitation of the vendors and suppliers are insufficient.

Accu-Tech Corporation, ADI, Anixter, Inc., Communications Supply Corporation, Graybar Electric Company, Norfolk Wire." (ECF No. 3, at ¶¶ 16–17.) Each of these companies is contained in the list of KNC's vendors and suppliers in the Consent Order.

42. KNC has pleaded enough facts to put Defendants on notice of the claims for breach of contract asserted against them to enable Defendants to "answer and prepare for trial." *Wake County,* 235 N.C. App. at 646, 762 S.E.2d at 486. Therefore, to the extent Defendants assert that KNC's claim for breach of contract should be dismissed based on a failure to adequately plead violations of the prohibition on soliciting KNC's vendors and suppliers, Defendants' motion should be DENIED.

43. In summary, the Court concludes that to the extent Defendants seek dismissal of the claim for breach of contract as alleged against Tutton, the motion should be DENIED.

*vii. KNC's claim for breach of contract against I-Tech.*

44. In addition to alleging a breach of contract claim against Tutton individually, in its second claim KNC alleges that I-Tech has breached the Settlement Agreement and Consent Order. (ECF No. 3, at ¶ 25–30.) KNC alleges that the Settlement Agreement binds Tutton's successors and assigns.[3] (*Id.* at ¶ 27; citing ECF No. 3 at Ex. 3, ¶ 11.) And that on "current information and belief, I-Tech is a

---

[3] The Consent Order contains no language permitting assignment of the rights and obligations under the Consent Order nor making it binding on successors or assigns. It is, at best, highly questionable whether the Consent Order could be binding on I-Tech, which was not a party to *Tutton I* and had not been formed as of the date the Consent Order was issued by the Court.

successor or assign of Tutton." (*Id.* at ¶ 28.) However, KNC does not allege any facts in support of the allegation that I-Tech is a successor of Tutton, nor that Tutton assigned his rights or obligations under the Settlement Agreement to I-Tech.

45. On the other hand, Defendants argue that I-Tech is not a successor of Tutton because Tutton does not own I-Tech. (ECF No. 6, at p. 16.) Defendants also contend that I-Tech is not bound by the Settlement Agreement because Tutton did not assign I-Tech any rights under the Settlement agreement. (*Id.*)

46. Although the current allegation that I-Tech has succeeded to or been assigned Tutton's obligations under the Settlement Agreement is threadbare, at this stage of the proceeding the Court concludes that it should not be dismissed, and Plaintiff should be permitted to take discovery on the issue. To the extent Defendants seek dismissal of the claim for breach of contract as against I-Tech, the motion should be DENIED.

## C. Tortious Interference with Contract

47. In its third claim, KNC alleges that the Settlement Agreement and Consent Order constitute valid contracts between KNC and Tutton, that I-Tech was aware of the contracts, and that I-Tech intentionally induced Tutton to breach the contracts without justification. (ECF No. 3, at ¶¶ 31–37.)

48. In support of dismissal, Defendants argue only that since KNC's claim for breach of contract should be dismissed, its claim for tortious interference also should be dismissed. (ECF No. 6, at p. 16.) Contrary to Defendants' argument, the Court has found that KNC has alleged a claim for breach of contract against Tutton.

Therefore, Defendants' motion to dismiss KNC's claim for tortious interference with a contract should be DENIED.

### D. Disregard of I-Tech's Corporate Form

49.    In its fourth claim, KNC asks the Court to disregard I-Tech's corporate form and hold it "jointly and severally liable" for Tutton's alleged unlawful conduct. (ECF No. 3, at ¶¶ 38–43.) Specifically, KNC asserts that Tutton has "complete control and domination over I-Tech such that it has no separate mind, will, or existence of its own." (*Id.* at ¶ 39.) KNC further alleges that Tutton has used his control of I-Tech to circumvent the restrictions placed on Tutton by the Consent Order and such actions have caused KNC injury. (*Id.* at ¶¶ 40–41.)

50.    Defendants contend that the allegations in KNC's complaint are only conclusory statements or legal conclusions and not facts that establish any of the elements that North Carolina courts use in deciding whether to disregard an entity's corporate form. (ECF No. 6, at pp. 7–8).

51.    In North Carolina, "[t]he general rule is that in the ordinary course of business, a corporation is treated as distinct from its shareholders." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 438, 666 S.E.2d 107, 112 (2008). While a corporation's liability shield "is not to be disregarded lightly," when circumstances call upon the courts to do so, "it may be permissible to look behind the corporate form." *Id.* at 438–39, 666 S.E.2d at 112. Indeed, allowing claimants to peel back the corporate curtain prevents those in control of a corporation from utilizing

the corporate form as a drape of liability armor, while engaging in fraud or other wrongful acts. *See id.* at 439, 666 S.E.2d at 112–13.

52. To properly state a claim for piercing the corporate veil, a claimant must allege that "the corporation is so operated that it is a mere instrumentality or *alter ego* of the sole or dominant share holder." *Green v. Freeman,* 367 N.C. 136, 145, 749 S.E.2d 262, 270 (2013) (citing *Henderson v. Security Mortg. & Finance Co.*, 273 N.C. 253, 260, 160 S.E.2d 39, 44 (1968)) (internal quotations omitted). In determining whether to pierce the corporate veil, courts look to evidence of "inadequate capitalization, noncompliance with corporate formalities, lack of a separate corporate identity, excessive fragmentation, siphoning of funds by the dominant shareholder, nonfunctioning officers and directors, and absence of corporate records." *Id.* at 145, 749 S.E.2d at 270. "The presence or absence of any particular factor . . . is [not] determinative. Rather, it is a combination of factors . . . which suggest that the corporate entity attacked had no separate mind, will[,] or existence of its own and was therefore the mere instrumentality or tool of the dominant corporation." *Fischer Inv. Capital, Inc. v. Catawba Dev. Corp.*, 200 N.C. App. 644, 651, 689 S.E.2d 143, 148 (2009) (internal citations and quotations omitted).

53. Once a party has established that the corporation is a mere instrumentality of a dominant shareholder and its form should be pierced, "the next inquiry is whether a noncorporate defendant may be held liable for her personal actions." *Green*, 367 N.C. at 145, 749 S.E.2d at 270. To show that a corporation is a mere instrumentality of a dominant shareholder, a plaintiff must show:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of [a] plaintiff's legal rights; and,

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Id.* at 145–46, 749 S.E.2d at 270.

54. Defendants argue that KNC's allegations are nothing more than a rote recitation of the veil piercing factors enumerated by North Carolina's appellate courts, with Tutton and I-Tech's names interjected throughout and fail to allege facts that would support a mere instrumentality theory. (ECF No. 6, at pp. 7–9.) KNC alleges that "Tutton has complete domination and control over I-Tech such that it has no separate mind, will, or existence of its own," (ECF No. 3, at ¶ 39), and that, on "information and belief, Tutton used the control to circumvent the prohibitions set forth in the Settlement Agreement and Consent Order." (*Id.* at ¶ 40.) However, KNC fails to provide any further factual basis for its claims. And this Court has provided that such "bare legal conclusions" do not garner "the presumption of truth afforded allegations on a motion to dismiss." *Blue Ridge Pediatric & Adolescent Med., Inc. v. First Colony Healthcare, LLC,* 2012 NCBC LEXIS 52, at *11, 16 (N.C. Super. Ct. Oct. 3, 2012); *see also W & W Partners, Inc. v. Ferrell Land Co., LLC,* 2018 NCBC LEXIS 52, at *25 (N.C. Super. Ct. May 22, 2018) (same).

55.     Moreover, as Defendants correctly point out, KNC has failed to allege facts in support of any of the factors North Carolina courts consider in determining whether a party has enough control to pierce the corporate veil, *inter alia*, inadequate capitalization, non-compliance with corporate formalities, or fragmentation. (ECF No. 6, at p. 8.) While the "presence or absence of any one factor" is not dispositive, here, there is no allegation of a "combination" whatsoever of any of the factors courts consider in determining the level of control held by a majority shareholder.

56.     The Court concludes that KNC's current allegations are insufficient to support the theory that I-Tech was a mere instrumentality of Tutton. Nevertheless, in the event Defendants later attempt to argue that Tutton cannot be held liable to certain conduct because it was I-Tech's action, or vice-versa, the Court believes KNC should be permitted to develop facts through discovery that would support its veil piercing theory. Therefore, Defendants' motion to dismiss KNC's claim to disregard I-Tech's corporate form should be GRANTED WITHOUT PREJUDICE, and KNC permitted to seek to timely amend the Complaint based on sufficient evidence.

**E. Misappropriation of Trade Secrets**

57.     In its fifth claim, KNC alleges that during Tutton's tenure with KNC, Tutton acquired KNC's "trade secrets, bidding strategies, supplier information, and customer lists" and has used KNC's confidential information, both individually and through I-Tech, to compete with KNC, in violation of the Consent Order, and to the injury of KNC. (ECF No. 3, at ¶¶ 44–48.)

58. Defendants contend that KNC's claim must be dismissed because KNC fails to allege facts that identify a trade secret sufficient to state a claim under the North Carolina Trade Secrets Protection Act ("TSPA"). (ECF No. 6, at p. 4.) Defendants argue that KNC has failed to allege anything about the trade secrets that make them "unique, specific, or unable to be recreated from information readily known and available to others in the computer cyber-security industry," and that "KNC relies exclusively on conclusory statements and legal conclusions . . . to support its claims for misappropriation of trade secret." (*Id.* at p. 5.) The Court agrees.

59. Pursuant to the TSPA a "trade secret" is defined as:

Business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy

N.C.G.S. § 66-152(3).

60. In North Carolina, "[t]o successfully plead a claim for misappropriation of trade secrets, a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court can determine whether misappropriation has or is threatened to occur." *Krawiec v. Manly,* 370 N.C. 602, 609, 811 S.E.2d 542, 547–48 (2018) (quoting *Washburn v. Yadkin Valley Bank & Tr. Co.,* 190 N.C. App. 315, 326, 660 S.E.2d 577,

585 (2008)) (internal quotations omitted). At the pleadings stage, claimants must do more than make "general allegations in sweeping and conclusory statements, without specifically identifying the trade secrets allegedly misappropriated." *Washburn,* 190 N.C. App at 327, 660 S.E.2d at 585. In *Krawiec,* the Supreme Court affirmed dismissal of a complaint that described the plaintiff's trade secrets as "original ideas and concepts for dance productions, marketing strategies and tactics, as well as student, client and customer lists and their contact information" because "[p]laintiffs provided no further detail about these ideas, concepts, strategies, and tactics sufficient to put defendants on notice as to the precise information allegedly misappropriated." 370 N.C. at 611, 811 S.E.2d at 549.

61. The complete extent of KNC's alleged trade secrets at issue in this case is described by KNC as "trade secrets, bidding strategies, supplier information, and customer lists." (ECF No. 3, at ¶ 45.) In its response brief, KNC contends that information contained in Tutton's affidavit, attached to the Complaint, further elucidates its alleged trade secrets by providing that in 2013 Nitor asked Tutton to download and remove from KNC "emails" and "customer files, bids, projects, design plans, and pricing schemes." (ECF No. 15, at p. 6.) KNC's description of its trade secrets falls well short of the mark. KNC has not alleged how any of this information is unique to KNC or could not be discovered and replicated by competitors.[4] *Krawiec*, 370 N.C. at 611, 811 S.E.2d at 549.

---

[4] The Court also notes that KNC alleges that Tutton last worked for KNC in November of 2013, almost five years prior to soliciting work from Guilford County Schools in June of 2018 as alleged in the Complaint. (ECF No. 3, at Ex. 4.) Accordingly, any information Tutton had

62.     Therefore, Defendants' motion to dismiss KNC's claim for misappropriation of trade secrets should be GRANTED.

**F. Unfair and Deceptive Trade Practices**

63.     In its sixth claim, KNC alleges that Defendants have engaged in unfair trade practices in violation of the UDTPA. (ECF No. 3, at ¶¶ 49–53.) Defendants' only argument in support of dismissal of KNC's claim for unfair and deceptive trade practices is that it should be dismissed because all of KNC's other claims are subject to dismissal. (ECF No. 6, at p. 17.) However, the Court has not dismissed KNC's claims for breach of contract or tortious interference with contract. *Branch Banking and Trust Co. v. Thompson*, 107 N.C. App. 53, 62, 418 S.E.2d 694, 700 (1992) (breach of contract can support a claim for unfair and deceptive trade practices when accompanied by substantial aggravating circumstances); *United Labs., Inc*, 322 N.C. at 664, 370 S.E.2d at 388 (1988) (conduct underlying tortious interference with non-compete agreements could support a claim for violation of UDTPA); *Veer Right Mgmt. Group, Inc. v. Czarnowski Display Serv.*, 2015 NCBC LEXIS 13, at *18 (N.C. Super. Ct. Feb 4, 2015) ("In appropriate circumstances, a claim for tortious interference may also support a section 75-1.1 violation.") Accordingly, Defendants' motion to dismiss KNC's claim for unfair and deceptive trade practices in violation of the UDTPA should be DENIED.

---

regarding KNC's bidding strategies, supplier information, project designs, and pricing were likely of no competitive value at the time and would not be trade secrets.

### G. Unjust Enrichment and Constructive Trust

64.    In its seventh claim, KNC alleges that Defendants have been unjustly enriched.  (ECF No. 3, at ¶¶ 54–58.)  KNC alleges that "Defendants have directly benefited from their violations of the terms of the Settlement Agreement and Consent Order, including through the use of KNC's trade secrets and confidential and proprietary information.  Defendants have a legal or equitable obligation to account for the benefits it wrongfully received at KNC's expense."  (*Id*. at ¶¶ 55–56.) Defendants argue, in part, that KNC's unjust enrichment claim should be dismissed because KNC failed to allege that KNC conferred any extra-contractual benefit upon Tutton or I-Tech.  (ECF No. 6, at pp. 17–18.)

65.    KNC's allegations reflect a continuing and widespread misunderstanding of the facts necessary to support a claim for unjust enrichment among the attorneys practicing before this Court.

> A claim for unjust enrichment "is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988).  "The general rule of unjust enrichment is that where services are rendered and expenditures made by one party to or for the benefit of another, without an express contract to pay, the law will imply a promise to pay a fair compensation therefor." *Atlantic C. L. R. Co. v. State Highway Comm'n*, 268 N.C. 92, 95-96, 150 S.E.2d 70, 73 (1966).
>
> In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party. *Southeastern Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200, 206

(2002). "The doctrine of unjust enrichment was devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *Collins v. Davis*, 68 N.C. App. 588, 591, 315 S.E.2d 759, 761 (1984).

*Chisum v. Campagna*, 2017 NCBC LEXIS 102, at *31–32 (NC Super. Ct. Nov. 7, 2017).

66.     Alleging merely that the Defendants have taken for themselves some benefit to which Plaintiff believes it is rightfully entitled does not state a claim for unjust enrichment.   Rather, a claim for unjust enrichment must be based on a contract implied in law in which one party has provided a benefit to another, such as goods or services, for which the first party should rightfully be compensated.  KNC does not allege that it conferred a benefit on Defendants; only that Defendants violated its rights and thereby obtained some benefit to themselves for which KNC believes it should be awarded damages.   *Id.* (unjust enrichment claim dismissed where plaintiff did "not allege that he conferred any benefit on the [defendants], but rather only that the [defendants] "received" or "wrongfully retained" benefits from their alleged misconduct."); *Islet Scis., Inc. v. Brighthaven Ventures*, LLC, 2017 NCBC LEXIS 4, at *15–18 (N.C. Super. Ct. Jan. 12, 2017) (unjust enrichment claim failed where plaintiff alleged only that it was damaged by defendants' conduct and not that it had conferred a benefit on defendant company).

67.     KNC has failed to allege facts to support a claim for unjust enrichment and Defendants' motion to dismiss the claim should be GRANTED.

68.     In its eighth claim, KNC alleges that a constructive trust should be imposed requiring Defendants to relinquish all profits resulting from the violations of the Settlement Agreement. (ECF No. 3, at ¶¶ 59–64.) In their motion to dismiss, Defendants contend that KNC's claim for constructive trust should be dismissed because KNC's complaint fails to state a claim for unjust enrichment. (ECF No. 6, at p. 18.)

69.     "When a court impresses a constructive trust upon property for the benefit of a claimant, it exercises its equitable powers to fashion remedies." *Weatherford v. Keenan*, 128 N.C. App. 178, 179, 493 S.E.2d 812, 813 (1997). "[A] constructive trust is not a standalone claim for relief or cause of action." *LLG-NRMH, LLC v. Northern Riverfront Marina & Hotel, LLLP*, 2018 NCBC LEXIS 105, at *14 (N.C. Super. Ct. Oct. 9, 2018) (citing *Weatherford* as quoted herein).

> A constructive trust is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 530, 723 S.E.2d 744, 751 (2012) (quoting *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 211, 171 S.E.2d 873, 882 (1970)).

70.     "There is a common, indispensable element in the many types of situations out of which a constructive trust is deemed to arise. This common element is some fraud, breach of duty or other wrongdoing by the holder of the property, or by

one under whom he claims." *Cury v. Mitchell,* 202 N.C. App. 558, 560–561, 688 S.E.2d 825, 827 (2010). However, conduct that falls "short of actual fraud will give rise to a constructive trust where retention of the property by the holder of the legal title would result in [] unjust enrichment. Fraud need not be shown if legal title has been obtained in violation of some duty owed." *Roper v. Edwards,* 323 N.C. 461, 465, 373 S.E.2d 423, 425 (1988) (internal citations and quotations omitted). Therefore, the Court concludes that to give rise to a constructive trust the claimant must allege a claim sounding in fraud or breach of a duty, or both, and such claim must cause the unjust enrichment of another.

71.     In this case, KNC does not have a claim arising from fraud or from a breach of duty by Tutton needed to support the remedy of constructive trust. KNC's unjust enrichment claim has already been dismissed. KNC has not alleged fraud against Defendants. Likewise, KNC does not allege that Tutton or I-Tech stood in a fiduciary relationship with KNC. While KNC still has viable claims for breach of contract, tortious interference, and UDTPA violations, without something more, KNC cannot support a claim for a constructive trust. *Security Nat'l Bank v. Educators Mut. Life Ins. Co.,* 265 N.C. 86, 94–95, 143 S.E.2d 270, 276 (1965) ("mere failure to perform an agreement or to carry out a promise . . . cannot in itself give rise to a constructive trust, since such a breach does not in itself constitute fraud or abuse of confidence, or duty requisite to the existence of a constructive trust; but a breach of agreement or promise may in connection with other circumstances give rise to such a trust.").

72.      North Carolina's appellate courts also have held that "[a] constructive trust does not arise where there is no fiduciary relationship and there is an adequate remedy at law." *Id.* at 95, 143 S.E.2d at 276 (1965); *Scheller v. Otterber,* 2011 N.C. App. LEXIS 244, at \*11–13 (2011).  Here, KNC has an adequate remedy at law for its remaining claims.  If Defendants were in fact the recipient of ill-gotten gains, KNC can recoup said gains through its breach of contract, tortious interference, and UDTPA claims.  Accordingly, this Court must conclude that KNC cannot seek the remedy of constructive trust, and Defendants' motion to dismiss KNC's claim for constructive trust should be GRANTED.

THEREFORE, it is ORDERED as follows:

1.  The Motion is DENIED as to KNC's First, Second, Third, and Sixth Claims.

2.  The Motion is GRANTED as to KNC's Fifth, Seventh, and Eighth Claims.

3.  The Motion is GRANTED WITHOUT PREJUDICE as to KNC's Fourth Claim.

SO ORDERED, this the 9th day of October, 2019.

/s/ Gregory P. McGuire
The Honorable Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases