Wright v. LoRusso, 2026 NCBC 24.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20CVS010612-590

JODY STANSELL, individually and
as a member of LORUSSO
VENTURES, LLC d/b/a
CINCH.SKIRT,

Plaintiff,

v.

KRISTA LORUSSO, individually and
as a member-manager of LORUSSO
VENTURES, LLC d/b/a
CINCH.SKIRT,

Defendant,

v.

LORUSSO VENTURES, LLC d/b/a
CINCH.SKIRT,

Nominal
Defendant.

**FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND FINAL JUDGMENT
FOLLOWING BENCH TRIAL**

1.     This case arises from a dispute among the members of LoRusso Ventures, LLC.  In late February 2026, the Court held a bench trial on claims asserted by Jody Stansell and counterclaims asserted by Krista LoRusso and LoRusso Ventures. Having considered all relevant evidence, the Court enters the following findings of fact, conclusions of law, and final judgment.

*Jody Stansell, pro se.*

*Leonard G. Kornberg, P.A., by Leonard G. Kornberg, for Defendant Krista LoRusso.*

*Higgins & Owens, PLLC, by Sally Higgins, for Nominal Defendant LoRusso Ventures, LLC.*

Conrad, Judge.

# I.
# PROCEDURAL HISTORY

2. This case began nearly six years ago. Since that time, the Court has issued many orders faulting Stansell and his onetime fellow plaintiffs, Nancy and Greg Wright, for delays, procedural miscues, rule violations, and failures to comply with orders. *See, e.g.*, *Wright v. LoRusso*, 2023 NCBC LEXIS 66, at *2–3 (N.C. Super. Ct. May 4, 2023) (observing that plaintiffs had "failed to comply with procedural rules throughout this case, wasting judicial resources and unnecessarily prolonging the litigation"); *Wright v. LoRusso*, 2022 NCBC LEXIS 69, at *5 (N.C. Super. Ct. June 9, 2022) ("Time and again, the Wrights and Stansell have shirked their responsibilities as litigants by disregarding deadlines established in the North Carolina Rules of Civil Procedure, the Business Court Rules, and this Court's orders."); *Wright v. LoRusso*, 2022 NCBC LEXIS 33, at *2–3 (N.C. Super. Ct. Apr. 22, 2022) (cataloging the plaintiffs' "[p]rocedural missteps" that "stymied this litigation from its start").

3. In June 2025, on the eve of a scheduled jury trial, the Wrights settled their disputes with LoRusso and LoRusso Ventures and dismissed their claims. Citing a conflict, Stansell's counsel then withdrew. As a result, the Court continued the trial and gave Stansell a reasonable period to try to retain new counsel. Stansell did not retain new counsel and now represents himself.

4. The Court reset the jury trial for February 2026 and issued a pretrial scheduling order that established deadlines for the parties to exchange exhibit and witness lists, serve objections, and file a proposed pretrial order. LoRusso and LoRusso Ventures complied with the pretrial scheduling order. Stansell, however,

did not timely serve his exhibit and witness lists, nor did he join in the submission of the proposed pretrial order.

5.     Before trial, LoRusso filed a motion in limine that sought, among other things, to bar Stansell from offering any exhibits and calling any witnesses not identified within the time allowed by the pretrial scheduling order.  Stansell did not submit a response to the motion in limine, and he failed to appear at the pretrial hearing on 6 February 2026.  As a result, the Court treated the motion in limine as an uncontested motion and granted it.  (*See* ECF No. 302 (observing that "Stansell has imposed on himself a heavy, self-inflicted penalty by failing to comply with the pretrial scheduling order, to respond to LoRusso's motion in limine, and to appear at the pretrial hearing").)

6.     Following this, Stansell sent a series of trial-related questions to the Court via email.[1]  The Court informed Stansell that it would not address his questions through an exchange of emails, noting that he could have and should have asked them in open court during the pretrial hearing.  To avoid wasting prospective jurors' time with these issues, the Court scheduled a conference to take place at 9:00 A.M. on 23 February 2026, the morning of trial.  (*See* ECF No. 305 (notice of conference).)

7.     When the Court called the conference to order on the morning of 23 February 2026, counsel for LoRusso and LoRusso Ventures were present, but Stansell was not.  Unsure whether Stansell had decided not to appear for trial (just as he had not

---

[1] In the same email, Stansell also stated that he had contacted or would be contacting the Federal Bureau of Investigation and the Mecklenburg County District Attorney to pursue criminal charges against LoRusso.

appeared for the pretrial hearing), the Court began discussing how to proceed with counsel in attendance. Midway through this discussion, Stansell arrived. After informing Stansell that his tardiness was disrespectful to the opposing parties, the Court reiterated its ruling on the motion in limine and explained the consequences. Because Stansell had not timely identified any exhibits or witnesses that he intended to offer, the Court stated that it would not allow him to offer any evidence other than his own testimony.

8. At the end of the conference and before the start of jury selection, all parties requested to forgo a jury trial in favor of a bench trial. The Court allowed that request.

9. Ten claims went to trial. Stansell asserted direct and derivative claims for breach of contract, as well as a claim for declaratory judgment. He also asserted vaguely defined claims for unjust enrichment and so-called oppression of minority members. In response, LoRusso asserted counterclaims for defamation, breach of contract, and declaratory judgment, and LoRusso Ventures asserted counterclaims for tortious interference with contract and prospective business relations.

10. During trial, Stansell testified in support of his own case in chief. In light of the Court's order on LoRusso's motion in limine and his own failures to comply with the pretrial scheduling order, Stansell called no witnesses other than himself and offered no exhibits.

11. After Stansell rested, counsel for LoRusso moved to dismiss the claims against her. The Court orally granted the motion as to Stansell's claims for unjust

enrichment and oppression of minority members but allowed the other claims to proceed.

12. In their cases in chief, LoRusso and LoRusso Ventures called LoRusso as a witness, recalled Stansell, and offered excerpts of Nancy Wright's deposition testimony. They also offered several documentary exhibits, all but one of which were admitted without objection.

13. At the conclusion of trial, the Court ordered each side to submit proposed findings of fact and conclusions of law on or before 11 March 2026. *See* BCR 12.11 ("The Court may require each party in a non-jury matter to file proposed findings of fact and conclusions of law."). LoRusso and LoRusso Ventures timely filed their joint proposal. (*See* ECF No. 309.) Stansell filed his proposal one day late. (*See* ECF No. 310.)

II.
FINDINGS OF FACT

14. Readers be warned: these findings of fact contain references to vulgarities and coarse language not typically found in judicial opinions. These references are, unfortunately, necessary to understand the relevant events and to provide context and support for the Court's judgment.

15. LoRusso Ventures is a small business that makes and sells an easy-to-install bed skirt or mattress cover for use in the hotel industry. LoRusso designed and developed this skirt product.

16. After meeting LoRusso in 2016, Stansell expressed interest in investing in her business. Stansell also introduced LoRusso to Nancy Wright and her husband, Greg Wright.

17. Stansell acquired a four percent membership interest in LoRusso Ventures in exchange for $40,000.

18. The Wrights acquired a twenty percent membership interest in LoRusso Ventures, which they relinquished in 2025 after reaching a settlement in this litigation with LoRusso and LoRusso Ventures.

19. At present, LoRusso owns a ninety-six percent interest in LoRusso Ventures, and Stansell owns the remaining four percent.

20. LoRusso and Stansell (along with the Wrights) entered into an operating agreement for the company, titled as the Amended and Restated Operating Agreement of LoRusso Ventures, LLC d/b/a/ Cinch.Skirt. (*See* LoRusso's Ex. 33 ["Op. Agrmt."].)

21. Section 2.6 of the operating agreement names LoRusso as the sole manager of LoRusso Ventures. LoRusso has remained the sole manager at all times relevant to this dispute.

22. Section 7.1 of the operating agreement contains a buy-sell provision. Upon the occurrence of a "Buy-Sell Event," the withdrawing member's interest may be redeemed on certain conditions. A "Buy-Sell Event" includes "[a]ny material breach of" the operating agreement by a member that "is not cured within ten (10) days after written notice of such breach is given to the" member.

23.    In section 9.13(c) of the operating agreement, the members agreed not to "make any statement (including to any media source) that would disrupt, impair, or affect adversely [LoRusso Ventures], or its employees, Managers, Members, officers, or directors, or place [LoRusso Ventures] or such individuals in any negative light."

24.    In section 9.13(d) of the operating agreement, the members agreed not to "disrupt, damage, impair, disparage, or interfere with the Business, whether by way of interfering with or disrupting [LoRusso Ventures'] relationship with employees, customers, agents, contractors, representatives, or vendors."

25.    As soon as Stansell became involved with LoRusso Ventures, he began handling sales for the company, but he received no compensation for his sales work until he became a member service provider in mid-2019. (*See* Op. Agrmt. § 2.11 (discussing compensation for member service providers).)

26.    Stansell did not view LoRusso—who was LoRusso Ventures' only manager—as his supervisor.

27.    LoRusso became dissatisfied with Stansell's performance, cooperativeness, reliability, and responsiveness.

28.    On 5 June 2020, LoRusso terminated Stansell's employment, as well as his right to access company emails and computer systems. (*See* LoRusso's Ex. 40.)

29.    When his employment ended, Stansell lashed out and began a sustained effort to ruin LoRusso Ventures' business and LoRusso's personal life.

30.    The record contains numerous text messages and other communications in which Stansell expressed animosity toward LoRusso and LoRusso Ventures and a

desire to seek revenge.  The recipients of these communications include the Wrights and others employed by LoRusso Ventures or elsewhere in the hotel industry.

31.    As examples, Stansell wrote that he was "determined to make [LoRusso] hurt"; that he "want[ed] her to never recover from this"; that "[t]here will be no mercy from this moment on"; that "[i]t's easier for [him] to just destroy the company at this point"; that he would "make [LoRusso's] life a nightmare and use [his] member status and the courts and every social media slut shame possible is coming"; and that he wanted "her in jail," "want[ed] those kids t[a]ken from her," and "wanted [LoRusso] begging for mercy . . . ."  (LoRusso's Exs. 4, 9, 13.)

32.    Stansell continued to send similar messages for many months.  Most shockingly, on 6 February 2021, Stansell sent a group text message about LoRusso in which he stated that he had a vision that he was

> going to cut that ugly ass cunt into pieces and feed her to the sharks only after I have tied her to a tree and poked a nearby bees nest which I'd did after I pulled each of her fingernails out and poured lemon juice on them, and after I started with a tongue lashing letting her know what a lieing, no good, immoral piece of shit she is.

> I am excited!

(LoRusso's Ex. 56 (all typographical errors in original).)  At trial, Stansell laughed after reading this quote aloud during his testimony.

33.    These were not idle or isolated statements.  Consistent with his expressed desire to separate LoRusso from her children, Stansell contacted an attorney representing LoRusso's former spouse during the pendency of their custody dispute for the purpose of "provid[ing] them with ammunition to take her kids away."

(LoRusso's Ex. 9; *see also* LoRusso's Ex. 56 ("I am more angry, determined, and obsessed with justice and revenge than anything I have ever been focused on in my life. . . . She should be scared.").)

34. The record also contains numerous text messages in which Stansell discussed having secretly, and without authorization, maintained access to email accounts and computer systems belonging to LoRusso Ventures.

35. Stansell's text messages make multiple references to "intercepting" emails from LoRusso Ventures' email accounts. In May 2021, Stansell boasted that he "[w]as sending nancy and Greg reports for past month [he] got off email." (LLC's Ex. 1 at 26, 27, 35.)

36. In September 2021, well after this case had begun, Stansell sent a text message to the Wrights stating that LoRusso "has changed the password to info@cinchskirt.com" and that "[w]e no longer have any access to information." Soon after, though, Stansell texted that LoRusso "has no idea we can see this" and that he "was able to back door into email" and "have the info email again." (LoRusso's Ex. 46; LLC's Ex. 1 at 6, 21.)

37. Through these unauthorized activities, Stansell gained access to privileged communications between LoRusso and her attorney, the contents of which he shared with others. (*See* LLC's Ex. 1 at 14, 17; LoRusso's Ex. 18 (text from Stansell stating that "Todd [LoRusso's attorney] also said that Jody must have some information that he shouldn't").)

38. At the same time that Stansell was telling others that he had secret, unauthorized access to LoRusso Ventures' accounts (roughly, September and October 2021), LoRusso Ventures experienced a series of unauthorized logins and attempted logins to its website, SharePoint files, Intuit account, and warehousing vendor from an unknown Windows-based device. LoRusso Ventures and its employees did not use Windows-based devices.

39. In his testimony, Stansell denied making any attempt to gain unauthorized access to LoRusso Ventures' email and other accounts. His testimony was not credible. In contemporaneous text messages, Stansell stated repeatedly that he had accessed the company's accounts and that he had shared information retrieved from those accounts with others. The Court finds, based on all available credible evidence, and by its greater weight, that Stansell accessed and interfered with LoRusso Ventures' email and other accounts without authorization.

40. Meanwhile, Stansell began interfering with LoRusso Ventures' relationship as a supplier for IHG, a global hotel company that owns many prominent hotel brands.

41. LoRusso Ventures' relationship with IHG goes back to 2017.

42. LoRusso Ventures was selected to provide products for Holiday Inn Express's remodeling initiative. Holiday Inn Express is one of IHG's brands. LoRusso Ventures devoted a substantial amount of time and expense, including developing custom fabrics and prototypes, to satisfy Holiday Inn Express's requirements. (*See* LLC's Ex. 3 at 1, 13.)

43. In May 2020, Stansell received and marked up a proposed contract for the Holiday Inn Express project without informing LoRusso. Shortly after, without authorization, Stansell ordered large quantities of custom fabric on behalf of LoRusso Ventures for the Holiday Inn Express contract. He later ordered 5,000 additional yards of a different fabric for that contract. Stansell would not have placed these orders if LoRusso Ventures had not had an established supplier relationship with IHG. (*See* LLC's Ex. 3 at 20–22.)

44. As part of the "early adopter program" for IHG and Holiday Inn Express, approximately 20 hotels were expected to buy an average of 150 skirts per property, equating to a profit of $30 to $40 per skirt for LoRusso Ventures. (LLC's Ex. 3 at 2.)

45. After LoRusso terminated Stansell, he told others that he "will make sure IHG doesn't happen." He went on to describe a plan to "cancel our purchase ready program and RFP with IHG" and to tell IHG that LoRusso Ventures was "not capable of signing a new contract with current management structure and account structure any longer." He added that his plan "stops this game cold and I will find something else to do before I let her have it," referring to IHG's business. (LoRusso's Exs. 11, 12, 15; *see also* LoRusso's Ex. 11 ("All I am doing is informing IHG that due to impossible clause, we must withdrawal from RFP . . . It's over and done").)

46. LoRusso Ventures maintained an account for an online proposal and vendor management system called Ariba, used by IHG. After Stansell's termination, LoRusso was unable to access LoRusso Ventures' Ariba account because the email address associated with the account was changed to jody_stansell@yahoo.com, an

email that had never been associated with LoRusso Ventures' business. Around this time, Stansell gloated that he had the "IHG system . . . locked down weeks ago." (LLC's Ex. 1 at 42; LLC's Ex. 3 at 28.)

47. On 15 October 2020, IHG informed LoRusso Ventures that it had been "selected for the program rollout" and invited to a meeting for suppliers. (LLC's Ex. 3 at 41.)

48. Just a few days later, without explanation, IHG reversed course and informed LoRusso Ventures that it would not be included. (*See* LLC's Ex. 3 at 41, 42.)

49. Nancy Wright testified that IHG's about-face was "shocking" and that it would be "reasonable" to ask whether Stansell had interfered. (N. Wright Dep. 133:3–15, 134:20–23.)

50. The Court finds, based on all available credible evidence, and by its greater weight, that Stansell intentionally disrupted LoRusso Ventures' access to IHG's Ariba system and induced IHG not to do business with LoRusso Ventures.

51. In 2018, LoRusso Ventures began pursuing a relationship with the LaQuinta hotel chain. (*See* LLC's Ex. 2 at 1.)

52. In September 2021, LaQuinta approved LoRusso Ventures' skirt product for use in a remodeling program. (*See* LLC's Ex. 2 at 4.)

53. Through his unauthorized access to LoRusso Ventures' email accounts, Stansell became aware of the LaQuinta business deal.

54. In a text message on 20 September 2021, Stansell informed the Wrights that he had received this "news off the email this morning," that LoRusso Ventures was "chosen" by LaQuinta for a program to "roll out this fall," and that, by his own calculation, LoRusso Ventures would earn $218,000 per year in profit. (LLC's Ex. 2 at 3.)

55. In the same message, Stansell told the Wrights that he and "Erica" (a sales employee with LoRusso Ventures) had met with LaQuinta representatives to develop this business. Stansell further stated that "Erica will . . . act as though she is delivering the news" to LoRusso, thus concealing his unauthorized access to the emails. (LLC's Ex. 2 at 3.)

56. In another text message, Stansell stated that he and Erica had "earned every cent of this business"—meaning the LaQuinta business—"and Krista can't have it. . . . Over my dead body." (LLC's Ex. 2 at 3.)

57. After selecting LoRusso Ventures' product, LaQuinta reversed course and removed it from the program. (*See* LLC's Ex. 2 at 6.)

58. In short, Stansell gained unauthorized access to emails concerning LoRusso Ventures' business with LaQuinta, coordinated efforts with a hostile employee of LoRusso Ventures (Erica) to deceive LoRusso, stated his intent to destroy LoRusso Ventures' business, claimed credit for the LaQuinta business, and declared that LoRusso could not have that business. The Court concludes that this direct and circumstantial evidence of intent and opportunity is credible and gives rise to an inference that Stansell intentionally induced LaQuinta not to do business with

LoRusso Ventures. The Court further finds, based on all available credible evidence, and by its greater weight, that Stansell intentionally disrupted LoRusso Ventures' relationship with LaQuinta.

59. In communications with third parties in the hotel industry, Stansell repeatedly called LoRusso a "thief," "embezzler," and "felon." At trial, Stansell admitted that he had made these statements and testified that he continues to do so. (LoRusso's Exs. 9, 20, 23.)

60. Stansell's statements—that LoRusso is a "thief," "embezzler," and "felon"— were false, and he presented no credible evidence to show that the statements were true.

61. Stansell knew that the statements were false when he made them, and he failed to exercise ordinary care to determine whether the statements were false.

62. Stansell referred to LoRusso as a "thief," "embezzler," and "felon" out of malice toward her.

63. In other communications with third parties, and as noted above, Stansell also frequently referred to LoRusso using language intended to place her in a negative light.

64. In addition to these findings, the Court finds by clear and convincing evidence that Stansell's conduct amounts to malice and willful and wanton conduct.

65. The Court also specifically finds that Stansell's testimony was not credible, apart from his statements against interest and other admissions supporting Defendants' claims. Stansell offered no corroborating evidence for his testimony. In

many instances, the documentary evidence directly refuted his testimony. For example, Stansell testified that LoRusso falsely told him, in 2017, that LoRusso Ventures owned a patent covering its skirt product when, in fact, a patent application was pending and not yet granted. But in an email in February 2017, Stansell acknowledged that the product was "patent pending." (LoRusso's Ex. 2.) In addition, Stansell admitted that much of his testimony was not based on first-hand knowledge, resting instead on speculation based on information that he gleaned from internet searches about LoRusso and LoRusso Ventures.

## III.
## CONCLUSIONS OF LAW[2]

66.   Generally, in civil cases, the burden of proof is by a preponderance of the evidence. *See, e.g.*, *Chase Dev. Grp. v. Fisher, Clinard & Cornwell, PLLC*, 211 N.C. App. 295, 303 (2011); *Braun v. Glade Valley School, Inc.*, 77 N.C. App. 83, 88–89 (1985).

67.   "Punitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages" and an aggravating factor is present. N.C.G.S. § 1D-15. The aggravating factor must be proven by clear and convincing evidence. *See id.* § 1D-15(b); *see also BDM Invs. v. Lenhil Inc.*, 264 N.C. App. 282, 311 (2019) ("[P]unitive damages must only be awarded if a defendant is liable for compensatory damages related to fraud, malice, or willful or wanton conduct.").

---

[2] Any finding of fact that is more accurately labeled a conclusion of law is incorporated by reference into the Court's conclusions of law. Likewise, any conclusions of law more accurately labeled as a finding of fact should be deemed as such.

68. **Stansell's Claims.** Stansell asserts direct and derivative claims for breach of contract based on allegations that LoRusso breached LoRusso Ventures' operating agreement and two purported oral contracts among the company's members. Stansell also asserts a claim for declaratory judgment in which he seeks a declaration that LoRusso's actions triggered a buy-sell event under the operating agreement.

69. No credible evidence supports these claims. The only evidence that Stansell offered was his own testimony, which is not credible for the reasons stated above. Accordingly, Stansell has not shown by a preponderance of the evidence that LoRusso breached the operating agreement, that LoRusso Ventures' members entered into any oral agreements, or that LoRusso breached the purported oral agreements. Nor has Stansell shown by a preponderance of the evidence that LoRusso's conduct triggered a buy-sell event under the operating agreement. LoRusso is entitled to judgment in her favor on each of these claims.

70. **LoRusso Ventures' Counterclaims.** LoRusso Ventures asserts counterclaims against Stansell for tortious interference with contract and prospective business relations.

71. "The tort of interference with contract has five elements: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a contractual right against a third person; (2) the defendant knows of the contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) and in doing so acts without justification; (5) resulting in actual damage to plaintiff." *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 661 (1988).

72. Tortious interference with prospective business relations, on the other hand, occurs when a defendant "acted without justification in inducing a third party to refrain from entering into a contract with [the plaintiff] which contract would have ensued but for the interference." *Walker v. Sloan*, 137 N.C. App. 387, 393 (2000) (citation and quotation marks omitted). Thus, "an action for tortious interference with prospective economic advantage may be based on conduct which prevents the making of contracts." *Owens v. Pepsi Cola Bottling Co.*, 330 N.C. 666, 680 (1992).

73. For these claims, "a plaintiff may recover his actual damages flowing from the tortious conduct." *United Labs., Inc. v. Kuykendall*, 335 N.C. 183, 191 (1993).

74. LoRusso Ventures has shown by a preponderance of the evidence that it had valid contractual relationships with IHG and LaQuinta to provide its bed skirt product, that Stansell knew of these contracts, that Stansell intentionally induced IHG and LaQuinta not to perform the contracts, that Stansell did so without legal justification, and that Stansell's conduct resulted in actual harm. Alternatively, if the evidence is insufficient to show that IHG's and LaQuinta's selections of LoRusso Ventures as a supplier gave rise to valid contractual relationships, then LoRusso Ventures has shown by a preponderance of the evidence that contracts with IHG and LaQuinta would have ensued from these selections but for Stansell's unjustified interference.

75. LoRusso Ventures has shown by a preponderance of the evidence that Stansell's intentional interference caused it harm in an amount no less than $90,000 (for IHG) and $218,000 (for LaQuinta). LoRusso Ventures suffered substantial

additional harms from the disruption of its relationships with IHG and LaQuinta, but these harms are difficult to quantify. Accordingly, the Court concludes that LoRusso Ventures is entitled to recover compensatory damages from Stansell in the amount of $308,000.

76. LoRusso Ventures has shown by clear and convincing evidence the aggravating factors of malice and willful and wanton conduct. Stansell's conduct, as reflected in the Court's findings, was egregious, malicious, and willful.

77. In its discretion, the Court concludes that LoRusso Ventures is entitled to recover punitive damages from Stansell in the amount of $200,000. This amount is appropriate when considering the reprehensibility and duration of Stansell's conduct, the actual damages suffered by LoRusso Ventures, and Stansell's concealment of his conduct. Also, this amount is appropriate when considering the purposes of punitive damages, namely "to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similarly wrongful acts." N.C.G.S. § 1D-1.

78. **LoRusso's Counterclaims.** LoRusso asserts counterclaims for breach of contract, declaratory judgment, and defamation.

79. The elements of a claim for breach of contract are the "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26 (2000).

80. "A contract that is plain and unambiguous on its face will be interpreted by the court as a matter of law." *Schenkel & Schultz, Inc. v. Hermon F. Fox & Assocs., P.C.*, 362 N.C. 269, 273 (2008).

81. If the contract does not define a term, then "non-technical words are to be given their meaning in ordinary speech, unless the context clearly indicates another meaning was intended." *Singleton v. Haywood Elec. Membership Corp.*, 357 N.C. 623, 629 (2003) (quoting *Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293, 299–300 (2000)).

82. "In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 245 N.C. App. 378, 385 (2016) (citation and quotation marks omitted).

83. "It is the policy" of North Carolina "to give the maximum effect to the principle of freedom of contract and the enforceability of the operating agreements." N.C.G.S. § 57D-10-01(c).

84. The operating agreement is valid and enforceable.

85. By intentionally interfering with LoRusso's and LoRusso Ventures' business relationships with IHG and LaQuinta, Stansell breached section 9.13(d) of the operating agreement. (*See* Op. Agrmt. § 9.13(d) (prohibiting "interfering with or disrupting Company's relationship with employees, customers, agents, contractors, representatives, or vendors").)

86. In addition, by repeatedly disparaging LoRusso in communications with third parties, Stansell breached section 9.13(c) of the operating agreement. (*See* Op. Agrmt. § 9.13(c) (barring members from making "any statements, written or oral . . . that would disrupt, impair, or affect adversely Company or its employees, Managers,

Members, officers, or directors, or place Company or such individuals in any negative light").)

87. LoRusso has not attempted to show that she suffered actual damages resulting from these breaches of contract; even so, she is entitled to nominal damages. *See, e.g., Bryan Builders Supply v. Midyette*, 274 N.C. 264, 271 (1968).

88. Accordingly, the Court concludes that LoRusso has shown by a preponderance of the evidence that Stansell breached the operating agreement. LoRusso is entitled to judgment on this claim in the amount of $1.

89. The Declaratory Judgment Act broadly authorizes courts "to declare rights, status, and other legal relations, whether or not further relief is or could be claimed." N.C.G.S. § 1-253. This includes "a declaration of rights, status, or other legal relations" under a contract. *Id.* § 1-254.

90. Stansell breached sections 9.13(c) and 9.13(d) of the operating agreement.

91. Stansell failed to cure these breaches after receiving notice of LoRusso's claims.

92. Stansell's multiple breaches amount to a buy-sell event under section 7.1(a) of the operating agreement.

93. Accordingly, the Court concludes that LoRusso has shown by a preponderance of the evidence that she is entitled to declaratory relief. The Court therefore declares that Stansell's breaches of the operating agreement resulted in a buy-sell event, triggering the provisions under section 7.1 in favor of LoRusso.

94.    To recover for defamation, a plaintiff must show "that the defendant caused injury to the plaintiff by making false, defamatory statements of or concerning the plaintiff, which were published to a third person." *Craven v. SEIU COPE*, 188 N.C. App. 814, 816 (2008) (citation and quotation marks omitted).

95.    Libel *per se* is "a publication which, when considered alone without explanatory circumstances: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace." *Phillips v. Winston-Salem/Forsyth Cnty. Bd. of Educ.*, 117 N.C. App. 274, 277 (1994). Slander *per se* is an equivalent oral statement. *See id.*

96.    In an action for defamation *per se*, "malice and damages are deemed presumed by proof of publication, with no further evidence required as to any resulting injury." *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 30 (2002).

97.    Stansell repeatedly told third parties in the hotel industry that LoRusso is a "thief," a "felon," and an "embezzler." These statements are false and defamatory *per se*. *See, e.g.*, *Donovan v. Fiumara*, 114 N.C. App. 524, 531 (1994) (observing that "statement that individual is a 'thief' would be slander *per se*"); *Matthews, Cremins, McLean, Inc. v. Nichter*, 42 N.C. App. 184, 187 (1979) ("Defamatory statements about a businessman imputing conduct derogatory to his reputation are actionable *per se* if they are uttered about him in his business relationship and affect him in his particular occupation."); *Dunn Holdings I, Inc. v. Confluent Health LLC*, 2018 NCBC

LEXIS 215, at *28 (N.C. Super. Ct. Dec. 10, 2018) ("[A] false statement that a party has embezzled can be interpreted as an accusation that the plaintiff committed a crime involving moral turpitude or an allegation that impeaches the plaintiff in his trade, business, or profession." (citation and quotation marks omitted)).

98. Stansell's defense—that these statements are true—is not supported by any credible evidence. Stansell knew or should have known that the statements were false. His statements to third parties in the hotel industry affect LoRusso in her occupation as a businesswoman in the hotel industry.

99. The Court concludes that LoRusso has shown that Stansell is liable for defamation *per se*. To the extent necessary, the Court concludes that LoRusso has established Stansell's liability by clear and convincing evidence.

100. The Court concludes that LoRusso is entitled to recover $100,000 as presumed damages for inconvenience and loss of reputation. This amount is reasonable, especially when considering that Stansell made these statements repeatedly, over a long period of time, and with the intent of destroying LoRusso's personal and professional relationships. *See, e.g.*, *Clark v. Clark*, 280 N.C. App. 384, 402 (2021) (noting that defamation *per se* "allows for presumed damages . . . without a showing of special damages").

101. Accordingly, the Court concludes that LoRusso is entitled to a judgment on this claim in the amount of $100,000.

## IV.
## CONCLUSION

102. Based on these findings of fact and conclusions of law, the Court **ENTERS FINAL JUDGMENT** as follows:

a. Judgment is entered for LoRusso as to all of Stansell's claims, and Stansell shall take nothing with respect to these claims.

b. Judgment is entered for LoRusso Ventures as to its claims for tortious interference with contract and prospective economic advantage, and Stansell shall pay to LoRusso Ventures $308,000 plus prejudgment interest in compensatory damages and $200,000 in punitive damages.

c. Judgment is entered for LoRusso as to her claims for breach of contract and defamation *per se*, and Stansell shall pay to LoRusso $100,001 plus prejudgment interest in compensatory damages.

d. Judgment is entered for LoRusso as to her claim for declaratory judgment, and the Court **DECLARES** that Stansell's breaches of the operating agreement resulted in a buy-sell event, triggering the provisions under section 7.1 in favor of LoRusso.

e. Postjudgment interest shall accrue on these awards at the legal rate until the judgment is paid.

f. The costs of this action are awarded to Defendants and are taxed to Stansell.

**SO ORDERED**, this the 18th day of March 2026.

/s/ Adam M. Conrad
Adam M. Conrad
Special Superior Court Judge
 for Complex Business Cases
